# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WILLIAM C. GARDNER, DDS,

      Plaintiff,

vs.                                    No. CIV 21-0003 JB/SMV

CHARLES SCHUMACHER, DDS;
DAVID WARREN III, DDS; BURRELL
TUCKER, DDS; LEO PAUL BALDERAMOS,
DDS; JOLYNN GALVIN, DDS; ERMELINDA
BACA, RDH; and MELISSA BARBRA, RDH,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Temporary Restraining Order, filed January 4, 2021 (Doc. 3)("TRO"). The Court held a hearing on January 6, 2021. See Clerk's Minutes at 1, filed January 6, 2021 (Doc. 8). The primary issues are: (i) whether the Court will need to abstain under Younger v. Harris, 401 U.S. 37 (1971)("Younger"), if State court proceedings are ongoing; (ii) whether the Court will need to refrain from hearing the case the Rooker-Feldman doctrine if State proceedings have concluded; and (iii) if the Court can hear the case, whether Plaintiff Dr. William C. Gardner meets the four requirements for injunctive relief: (a) whether Dr. Gardner is likely to succeed on the merits of his procedural due process claim that the Defendants -- Dr. Charles Schumacher, Dr. David Warren III, Dr. Burrell Tucker, Dr. Leo Paul Balderamos, Dr. Jolynn Galvin, Ms. Ermelinda Baca, and Ms. Melissa Barbra -- did not allow him to examine original evidence and were not impartial in their decision to revoke his license to practice dentistry in New Mexico, and thereby violated his procedural due process rights under the Fourteenth Amendment of the Constitution of the United

States of America; (b) whether Dr. Gardner can show that he faces irreparable harm because of the Defendants' procedural due process violations; (c) whether Dr. Gardner's injury outweighs any harm to other parties; and (d) whether that granting the TRO would be in the public interest.  The Court concludes: (i) that it will likely need to abstain under Younger from enjoining an ongoing state proceeding because: (a) there are ongoing State administrative proceedings; (b) the regulation and licensure of dentists involves important State interests; and (c) the State proceedings afford Dr. Gardner an adequate opportunity to raise the federal issues; (ii) that, even if the State proceedings are no longer ongoing, the Court would likely have to refrain from hearing the case the Rooker-Feldman doctrine, because the Court cannot serve as an appellate court to State court proceedings; and (iii) that Dr. Gardner does not meet the requirements for injunctive relief, because (a) he is not likely to succeed on the merits of his procedural due process claim, because the Defendants' use of photocopies of the lost evidence likely did not place Dr. Gardner at risk of erroneous deprivation, because he cannot show prejudice, and the Defendants were likely impartial, because the Defendants do not have a substantial pecuniary interest in the outcome of the case; (b) Dr. Gardner cannot show that he faces irreparable harm, because he delayed in seeking injunctive relief; (c) the balance of equities weighs against Dr. Gardner, because he asserts no harm other than his due process claim, which is not likely to succeed; and (d) the requested injunction would be adverse to the public interest, because public interest in this case is aligned with the Defendants' important interest in regulating state dental licenses.  Accordingly, the Court denies the TRO.

# FINDINGS OF FACT

"A temporary restraining order requires the Court to make predictions about the plaintiff's likelihood of success." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.). Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2). "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only). See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union  No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).

The United States Court of Appeals for the Tenth Circuit notes "that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Thus, while the Court does the best it can to make good findings from the record that it has and in the short time that it has to make findings, these findings of fact are relevant only for the purpose of  determining whether to issue a TRO and do not bind the Court or the parties at trial. Accordingly, the Court finds as follows:

1.      <u>**The Parties.**</u>

1.      Dr. Gardner is a resident of New Mexico.  <u>See</u> Complaint ¶ 1, at 1, filed January 6, 2021 (Doc. 3).

2.      Defendant Dr. Charles Schumacher is a dentist licensed to practice in New Mexico. <u>See</u> Complaint ¶ 4, at 1.

3.      Defendant Dr. David Warren III is a dentist licensed to practice in New Mexico. <u>See</u> Complaint ¶ 4, at 1.

4.      Defendant Dr. Burrell Tucker is a dentist licensed to practice in New Mexico.  <u>See</u> Complaint ¶ 4, at 1.

5.      Defendant Dr. Leo Paul Balderamos is a dentist licensed to practice in New Mexico. <u>See</u> Complaint ¶ 4, at 1.

6.      Defendant Dr. Jolynn Galvin is a dentist licensed to practice in New Mexico.  <u>See</u> Complaint ¶ 4, at 1.

7.      Defendant Ermelinda Baca is a dental hygienist working in New Mexico.  <u>See</u> Complaint ¶ 4, at 1-2.

8.      Defendant Melissa Barbra is a dental hygienist working in New Mexico.  <u>See</u> Complaint ¶ 4, at 1-2.

9.      The New Mexico Board of Dental Health Care (the "Dental Board") is a nine-member statutory entity consisting of five dentists that the New Mexico Governor appoints; two dental hygienists; and two public members.  <u>See</u> N.M.S.A. §§ 61-5A-8(A)-(B).

10.     All of the Defendants are Dental Board members.  <u>See</u> Complaint ¶ 4, at 1; <u>Boards</u> <u>and   Commissions</u>,   New   Mexico   Regulation   &   Licensing   Department,

- 4 -

http://www.rld.state.nm.us/boards/Dental_Health_Care_Members_and_Meetings.aspx (last visited January 7, 2021)(listing Defendants Schumacher, Warren, Tucker, Balderamos, Galvin, Baca, and Barbra as Dental Board members).

11.     The Dental Board has the power to "enforce and administer the provisions of the Dental Health Care Act[1] and the Dental Amalgam Waste Reduction Act.[2]" N.M.S.A. § 61-5A-10(B).

12.     The Dental Board has the power to "grant, deny, review, suspend and revoke licenses and certificates to practice dentistry," "censure, reprimand, fine and place on probation and stipulation dentists," and "grant, deny, review, suspend and revoke licenses to own dental practices," "in accordance with the Uniform Licensing Act for any cause stated in the Dental Health Care Act and the Dental Amalgam Waste Reduction Act." N.M.S.A. §§ 61-5A-10(F)-(G).

13.     The Dental Board

oversees the practice of dentistry, dental hygiene, dental assisting, expanded function dental auxiliary and community dental health coordinator in New Mexico. The Board sets professional and educational standards to obtain and maintain licenses for dentist, dental hygiene, dental assistants, expanded function dental auxiliary and community dental health coordinator practicing in New Mexico.

The Board also investigates complaints from the public about unprofessional or unethical conduct, and takes disciplinary action when required

---

[1]The Dental Health Care Act, N.M.S.A.§ 61-5A-10, regulates the practice of dentistry in New Mexico.

[2]The Dental Amalgam Waste Reduction Act, N.M.S.A.§§ 61-5C-1 to 6, regulates the use of amalgam, a "dental restorative material that is typically composed of mercury, silver, tin and copper, along with other metallic elements, and that is used by a dentist to restore a cavity in a tooth," N.M.S.A.§ 61-5C-1, and requires "dental office[s] [to have] . . . an appropriately sized amalgam separator system," N.M.S.A.§ 61-5C-3.

Dental Health Care: Overview, New Mexico Regulation & Licensing Department, http://www.rld.state.nm.us/boards/dental_health_care.aspx (last visited January 7, 2021).

14.     Delta Dental of Michigan, an affiliate of Delta Dental of New Mexico (collectively, "Delta Dental"), is a provider of dental insurance to citizens of New Mexico.  See Complaint ¶ 10, at 2 (asserting this fact); About Delta Dental of Michigan, Delta Dental of Michigan, https://www.deltadentalmi.com/About (last visited January 7, 2021)(stating that Delta Dental of Michigan is an affiliate of New Mexico).

15.     The dentists, Drs. Schumacher, Warren, Tucker, Balderamos, and Galvin, have a premier contract with Delta Dental pursuant to which the dentists receive referrals from Delta Dental.  See Complaint ¶ 12, at 2-3.

16.     Baca and Barbara, the two dental  hygienists, are employed by a dental practice that has a premier contract with Delta Dental.  See Complaint ¶ 13, at 3

### 2.     Revocation of Dr. Gardner's License to Practice Dentistry in New Mexico and the Related State Court Proceedings.

17.     Up until January 1, 2020, Dr. Gardner was licensed to practice dentistry in New Mexico.  See Complaint ¶ 9, at 2 (asserting this fact); In the Matter of: William Dr. Gardner, D.D.S. License No. DD1867, Case No. 18-61-COM (N.M. Bd. Dental Healthcare Nov. 26, 2019), available at http://www.rld.state.nm.us/boards/Dental_Health_Care_Disciplinary_Actions.aspx ("Dental Board Nov. 26 Decision")(revoking Dr. Gardner's license to practice dentistry, effective January 1, 2020).[3]

---

[3]Gardner did not attach any evidentiary exhibits to assist his TRO.  See TRO at 1-4.  Under rule 201(b) of the Federal Rules of Evidence, courts may take judicial notice of any "fact that is not subject to reasonable dispute because it: (i) is generally known within the trial court's territorial jurisdiction; or (ii) can be accurately and readily determined from sources whose accuracy cannot

18.     Dr. Gardner's dispute with the Dental Board dates back to at least 2014, when the

Dental Board made findings that Dr. Gardner violated various state laws and demonstrated

unprofessional conduct by, inter alia, failing to release records due to a billing dispute; failing to

advise a patient regarding proper treatments; and employing abusive billing practices.  See William

Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2014-3969,

Final Decision and Order attached to 2014 Disciplinary Appeal, Second Judicial District Court,

State of New Mexico, County of Bernalillo (filed June 11, 2014)("2014 Disciplinary Order").  See

also William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-

---

reasonably be questioned." Fed. R. Evid. 201(b).  The Court takes judicial notice of all the
disciplinary proceedings before the Dental Board, because they are procedural matters in front of
state administrative agency, accessible to the public. See Fed. R. Evid. 201(b); N. New Mexico
Stockman's Ass'n v. United States Fish & Wildlife Serv., No. CIV 18-1138 JB\JFR, 2020 WL
6048149, at *59 (D.N.M. Oct. 13, 2020)(Browning, J.)("Tenth Circuit precedent indicates,
however, that the ordinary evidentiary rules regarding judicial notice apply when a court reviews
agency action.")(citing New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683,
702 n.21 (10th Cir. 2009)(citing Fed. R. Evid. 201(b))("We take judicial notice of this document,
which is included in the record before us in [another case].")); Cheney v. Dean, No. CIV 18-0196
JB\CG, 2020 WL 2745521, at *1 (D.N.M. May 27, 2020)(Browning, J.)("The San Juan County
District Court docket entries are subject to judicial notice.")(citing United States v. Ahidley, 486
F.3d 1184, 1192 n.5 (10th Cir. 2007)(courts have "discretion to take judicial notice of publicly-
filed records . . . and certain other courts concerning matters that bear directly upon the disposition
of the case at hand"); Stack v. McCotter, 79 F. App'x 383 (10th Cir. 2003)(holding that a state
district court's docket sheet was an official court record subject to judicial notice under rule 201
of the Federal Rules of Evidence); Van Duzer v. Simms, No. CIV 18-0405 JB/LF, 2018 WL
2138652, at *1, n.1 (D.N.M. May 9, 2018)(Browning, J.)(noting that courts may take judicial
notice of New Mexico state criminal dockets)).
        Although, the Dental Board revoked Gardner's dental license, effective January 1, 2020,
the New Mexico state district court, ordered a temporary stay of the Dental Board Nov. 26
Decision, see Order for Stay at 3, filed Dec. 19, 2019 in the First Judicial District Court, Santa Fe
County, State of New Mexico, No. D-101-CV-2019-02207, which was later lifted, effective July
14, 2020, see Order at 1-2, filed July 7, 2020 in the First Judicial District Court, Santa Fe County,
State of New Mexico, No. D-101-CV-2019-02207.  The Court takes judicial notice of the state
court proceedings.

2014-3969, Notice of Appeal of Agency Decision, Second Judicial District Court, State of New Mexico, County of Bernalillo (filed June 11, 2014)("2014 Disciplinary Appeal"); William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2014-3969, Judgment on the Mandate Second Judicial District Court, State of New Mexico, County of Bernalillo (filed March 29, 2016)(stating that Dr. Gardner appealed the 2014 Disciplinary Order to state court, but he was unsuccessful)

19.      In 2016 and 2017, the Dental Board conducted additional disciplinary proceedings. See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2016-03857, Verified Petition for Writ of Mandamus, filed in the Second Judicial District Court, State of New Mexico County of Bernalillo (filed June 16, 2016)("2016 Mandamus Petition").

20.      The Dental Board made findings that Dr. Gardner acted with gross negligence; failed to timely release a patient's medical records; and overbilled a patient.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2017-08564,  Notice of Appeal, Second Judicial District Court, State of New Mexico, County of Bernalillo, (filed November 30, 2017)("2017 Disciplinary Appeal"); William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2017-08564, Decision and Order attached to 2017 Disciplinary Appeal at 4, Second Judicial District Court, State of New Mexico, County of Bernalillo, (filed November 30, 2017)("2017 Disciplinary Order").

21.      The 2017 Disciplinary Order also found that "[n]o credible evidence was submitted into the record to support [Dr. Gardner's] claims that the [Dental] Board acted in any manner that would reveal a bias or prejudgment against [Dr. Gardner] or any influence by Delta Dental."  2017 Disciplinary Order at 5.

22.     Following those findings, the Dental Board directed Dr. Gardner to complete additional training courses and pay a $3,000 fine and $3,189.97 in costs by January 8, 2018.  See 2017 Disciplinary Order at 6.  The Dental Board further warned:

> Respondent's failure to comply with the provisions of this Decision and Order shall result in the automatic suspension of his [respondent's] dental license until after a hearing on the matter.  An Order to Show Cause hearing shall be set as soon as is practicable after the breach of the Order.  The hearing may result in the Board taking additional disciplinary action against the Respondent up to and including revocation of Respondent's dental license.

2017 Disciplinary Order at 6.

23.     Dr. Gardner appealed the 2017 Disciplinary Order, but the appeal failed.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. A-1-CA-37545, Order Denying Petition for Writ of Certiorari, Court of Appeals of the State of New Mexico (filed November 28, 2018).

24.     On August 1, 2018, Dr. Gardner filed another emergency request for mandamus relief after the Dental Board again sought to convene a disciplinary hearing.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-1329-CV-2018-01687, Emergency Verified Petition for Writ of Mandamus, Thirteenth Judicial District Court, State of New Mexico, County of Sandoval (filed August 1, 2018).

25.     The state court dismissed the 2018 Mandamus Petition on June 6, 2019.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-1329-CV-2018-01687, Disposition Order for Lack of Prosecution, Thirteenth Judicial District Court, State of New Mexico, County of Sandoval (filed June 6, 2019).

26.     In 2018, the Dental Board moved to suspend Dr. Gardner's license for failure to take continuing education courses, as the 2017 Disciplinary Order requires.  See 2017 Disciplinary Order at 4.

27.     On September 17, 2018, Dr. Gardner filed a sworn petition to restrain the Dental Board from suspending his license based on, among other things, due process violations.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-1329-CV-2018-02000, Petition for Preliminary Injunction to Stay Any Proceedings Against the Petitioner in Regards to the Suspension of his Dental License, Thirteenth Judicial District Court, State of New Mexico, County of Sandoval (filed September 17, 2018 )("2018 Injunction Petition").

28.     The state court eventually denied the 2018 Injunction Petition.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-1329-CV-2018-02000, Order, Thirteenth Judicial District Court, State of New Mexico, County of Sandoval (filed April 15, 2020).

29.     On July 9, 2018, the Dental Board learned that Dr. Gardner was practicing dentistry without a license and filed a Petition to Enforce Compliance with Board's Subpoena.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2018-8379, Petition to Enforce Compliance with Board's Subpoena, Second Judicial District Court, State of New Mexico, Country of Bernalillo (filed November 15, 2018 )("2018 Dental Board Petition").

30.     The 2018 Dental Board Petition alleged Dr. Gardner treated eighty-two people without a license and that he admitted during a deposition to practicing dentistry without a license. See 2018 Dental Board Petition at 1.

31.     The state court granted the 2018 Dental Board Petition, and allowed the Dental Board to investigate and to assess civil penalties for practicing dentistry without a license.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-202-CV-2018-8379, Amended Order to Comply with Board's Subpoena, Second Judicial District Court, State of New Mexico, Country of Bernalillo (filed July 3, 2019).

32.     On December 10, 2018, the Dental Board received a sworn complaint from Delta Dental of New Mexico ("Insurance Fraud Complaint"), alleging that Dr. Gardner manipulated or altered diagnostic information to obtain benefit payments.  See In the Matter of: William Dr. Gardner, D.D.S. License No. DD1867, Case No. 18-61-COM, at 2 (N.M. Bd. Dental Healthcare May             2,             2019),             available             at http://www.rld.state.nm.us/boards/Dental_Health_Care_Disciplinary_Actions.aspx ("Notice of Contemplated Action"); William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case. No. D-101-CV-2019-02207, Verified Complaint and Application for an Emergency Preliminary Injunction and/or Temporary Restraining Order at 59-60, First Judicial District Court, State of New Mexico, County of Santa Fe (filed August 16, 2019)("NM State Court Complaint")(attaching the sworn Insurance Fraud Complaint as an exhibit).

33.     The Insurance Fraud Complaint alleges that Dr. Gardner "[m]anipulate[ed] . . . diagnostic information with the intent to obtain benefit payments."  NM State Court Complaint at 57.

34.     The Insurance Fraud Complaint alleges that "Dr. Gardner submitted multiple claims for a porcelain/metal crown" to Delta Dental, and that Dr. Gardner attached a "radiograph

. . . [that] appears to have been manipulated in some form to indicate advanced caries."  NM State Court Complaint at 60 (attaching images of the alleged manipulation).

35.     On May 2, 2019, the Dental Board notified Dr. Gardner that it had received the Insurance Fraud Complaint, and stated that if Dr. Gardner did not "explain[] or rebut[]" the Insurance Fraud Complaint allegations at "a formal hearing," the Board would revoke Dr. Gardner's license to practice dentistry.  Notice of Contemplated Action at 5.

36.     On June 27, 2019, Dr. Gardner deposed the author of the Insurance Fraud Complaint.  See NM State Court Complaint at 61-71 (attaching the deposition as an exhibit).

37.     The deposition includes the following exchange with the author of the Insurance Fraud Complaint:

Q:      "Do you still have the original image that you received from Dr. Gardner?"

A:      "I believe we do not."

NM State Court Complaint at 63 (quotations from the Dep. of Jason Snider at 16:20-22 (taken June 27, 2019), attached as Exhibit 4 to NM State Court Complaint).

38.     Dr. Gardner filed several motions with the Dental Board, including (i) a motion to dismiss the Notice of Contemplated action, which the Board denied; and (ii) a motion to recuse the Board members, because the Board members are alleged Delta Dental premier providers, which the Board denied.  See NM State Court Complaint ¶¶ 18-19, 22, 27, 30, 32, 38-39,  at 5-9.

39.     The Dental Board set a hearing for August 22, 2019.  See NM State Court Complaint ¶ 40, at 9; id. at 162 (attaching the Board's Notice of Hearing as an exhibit).

40.     On August 16, 2019, before the Dental Board could hold the hearing, Dr. Gardner filed a complaint and a motion for TRO in the First Judicial District Court, State of New Mexico,

County of Santa Fe, seeking to enjoin the Board from revoking his license to practice dentistry. See NM State Court Complaint at 1.

41. On August 21, 2019, in state court, the Dental Board filed a motion to dismiss Dr. Gardner's NM State Court Complaint, arguing that Dr. Gardner had failed to exhaust his administrative remedies and that the state court lacked of subject matter jurisdiction. See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Defendant's Motion to Dismiss Plaintiff's Verified Complaint and Application for an Emergency Preliminary Injunction and/or Temporary Restraining Order Based on Failure to Exhaust Administrative Remedies and Lack of Subject Matter Jurisdiction at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed August 21, 2019).

42. On September 9, 2019, and October 9, 2019, the Dental Board held a hearing on the allegations described in the Notice of Contemplated Action. See Dental Board Nov. 26 Decision at 1 (stating these procedural facts).

43. At the September 9, 2019, Dental Board hearing, Dr. Gardner was present, and counsel represented him. See Dental Board Nov. 26 Decision at 1 (stating these procedural facts).

44. At the October 9, 2019, Dental Board hearing, Dr. Gardner was not present, but counsel represented him. See Dental Board Nov. 26 Decision at 1 (stating these procedural facts).

45. On November 26, 2019, the Dental Board issued a decision, revoking Dr. Gardner's license to practice dentistry, effective January 1, 2020. See Dental Board Nov. 26 Decision at 5.

46. The Dental Board Nov. 26 Decision makes several findings of fact:

1. A pre-op x-ray/radiograph is an x-ray/radiograph taken before any dental procedures are performed on the tooth.

2.     The second x-ray/radiograph submitted to Delta Dental is a photo copy of the first x-ray/radiograph submitted to Delta Dental:

     a.     The first x-ray/radiograph is properly cut diagonally at the corners as would be expected in a copy of the original x-ray/radiograph whereas the second shows the outline where the diagonally cut corners were but the second x-ray/radiograph shows 90 degree corners.

     b.     Neither x-ray/radiograph show that one of the cusps have been removed. Both x-rays/radiographs show both cusps in place are identical except for the decay in the second x-ray/radiograph.

     c.     Both x-rays/radiographs are taken at the exact same angle which is physically impossible unless the second x-ray/radiograph is taken immediately after the first x-ray/radiograph is taken.

     d.     Both x-rays/radiographs show an identical dot on the upper right hand side of the x-rays/radiographs which would not appear if the x-rays/radiographs were taken separately at different times.

3.     It is not credible to believe that Respondent would submit the first x-ray/radiograph showing no decay with his second insurance claim when requesting payment for a crown because Delta Dental only pays for one x-ray/radiograph. When submitting x-rays/radiographs for payment of necessary dental procedures such as a crown, Respondent would have submitted the second x-ray/radiograph, if it existed, showing the decay in support of the necessity for the crown.

Dental Board Nov. 26 Decision at 3.

47.     The Dental Board Nov. 26 Decision states that "[s]ubstantial evidence supports a finding that Respondent" (i) "submitted false claim forms to Delta Dental for the purpose of obtaining payment for unnecessary dental procedure;" (ii) falsified a x-ray/radiograph"; and (iii) "failed to cooperate with the Board investigation when he refused to provide the original x-

rays/radiographs and patient records in his sole possession to the Board." Dental Board Nov. 26 Decision at 5.

48.     The Dental Board Nov. 26 Decision states that Dr. Gardner has the right to appeal the Board's decision, by filing an appeal in a state district court.  See Dental Board Nov. 26 Decision at 6.

49.     On December 17, 2019, Dr. Gardner filed a notice of appeal of the Dental Board Nov. 26 Decision in state court.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Notice of Appeal of the Dental Board's Decision and Order at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed December 17, 2019)("Appeal of Dental Board Nov. 26 Decision").

50.     On December 19, 2019, Dr. Gardner filed an amended notice of appeal of the Dental Board Nov. 26 Decision in state court.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, First Amended Notice of Appeal at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed December 19, 2019)

51.     On December 19, 2019, Dr. Gardner filed an emergency motion to stay the Dental Board Nov. 26 Decision in state court.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Plaintiff's Emergency Motion for Stay of the New Mexico Dental Board's November 26, 2019 Decision and Order to Revoke Plaintiff's Dental License on January 1, 2020 at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed December 19, 2019)("Emergency Motion to Stay").

52.     On December 19, 2019, the New Mexico state district court granted the Emergency Motion to Stay until further order by the court.  See William Gardner, D.D.S. v. New Mexico

Board of Dental Health Care, Case No. D-101-CV-2019-02207, Order for Stay at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed December 19, 2019)("Order Granting Stay").

53.     On June 15, 2020, the New Mexico state district court held a hearing on the stay and the Dental Board's motion to dismiss.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Order at 1-2, First Judicial District Court, State of New Mexico, County of Santa Fe (filed July 7, 2020)("Order Lifting the Stay")(describing the procedural history)

54.     On July 7, 2020, the New Mexico state district court entered an order (i) lifting the stay; (ii) permitting the Dental Board to enforce the Board Nov. 26 Decision; and (iii) dismissing Dr. Gardner's appeal of Dental Board Nov. 26 Decision.  See Order Lifting the Stay at 3.

55.     On July 15, 2020, Dr. Gardner filed a motion for relief from judgment under rule 1-060 of the New Mexico Rule of Civil Procedure for the District Courts.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Plaintiff's NMRA Rule 1-060 Motion at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed July 15, 2020).

56.     On July 20, 2020, Dr. Gardner filed a request for an emergency stay in the Supreme Court of the State of New Mexico.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, No. S-1-SC-38394, Verified Petition for Writ of Error of Superintending Control and Request for Emergency Stay at 1, Supreme Court of the State of New Mexico (filed July 20, 2020).

57.     On July 24, 2020, Dr. Gardner filed an emergency motion for stay in the Court of Appeals of the State of New Mexico.  See William Gardner, D.D.S. v. New Mexico Board of

Dental Health Care, Appeal No. A-1-CA-39118, Verified Emergency Motion for Stay of Proceedings of the District Court's Dismissal of Plaintiff's Appeal and the Revocation of Plaintiff's Dental License at 1, Court of Appeals of the State of New Mexico (filed July 24, 2020).

58.     Later that same day, the Court of Appeals of the State of New Mexico denied Dr. Gardner's Emergency Motion for Stay.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Appeal No. A-1-CA-39118, Order on Emergency Motion for Stay, Court of Appeals of the State of New Mexico (filed July 24, 2020).

59.     On August 13, 2020, the Supreme Court of the State of New Mexico denied Dr. Gardner's request for an emergency stay.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, No. S-1-SC-38394, Order at 1-2, Supreme Court of the State of New Mexico (filed August 13, 2020).

60.     On November 17, 2020, the New Mexico state district court denied Dr. Gardner's motion for relief from judgment.  See William Gardner, D.D.S. v. New Mexico Board of Dental Health Care, Case No. D-101-CV-2019-02207, Order at 1, First Judicial District Court, State of New Mexico, County of Santa Fe (filed November 17, 2020).

61.     On November 17, 2020, Dr. Gardner filed an update on pending matters before the New Mexico state district court, arguing (i) that the New Mexico state district court has only resolved his Appeal of the Dental Board Nov. 26 Decision; (ii) that the Appeal of the Dental Board Nov. 26 Decision "was filled in the current cause number in error and should have been a separate cause of action.  The revocation [of his license] was not part of the due process violations presented in the Complaint"; and (iii) that the New Mexico state district court has not resolved the issues raised in his NM State Court Complaint.  William Gardner, D.D.S. v. New Mexico Board of Dental

- 17 -

Health Care, Case No. D-101-CV-2019-02207, Plaintiff's Brief Regarding Pending Matters as Ordered November 5, 2020 at 3, First Judicial District Court, State of New Mexico, County of Santa Fe (filed November 17, 2020)("Brief on Pending Matters").

62.     In his Brief Regarding on Matters, Dr. Gardner asserts:

*Remaining issues under the Court's Jurisdiction*

As discussed above, the remaining issues in this case involved the ones in the underlying Complaint.  Those include due process violations, conflicts of interest, and evidentiary issues.  None have been adjudicated.  The only venue they can be heard in is the current Court.

In conclusion, there remain pending issues that should be permitted to go to trial.

Brief on Pending Matters at 3-4 (emphasis in the original).

63.     The state docket reflects that Dr. Gardner is still pursuing several pending state appeals, including:

i.     Gardner v. New Mexico Board of Dental Health Care, Appeal No. A-1-CA-38981, Court of Appeals of the State of New Mexico (appealing the denial of Petition for Preliminary Injunction to Stay any Proceedings Against the Petitioner in Regards to the Suspension of his Dental License, Case No. D-1329-CV-2018-02000); and

ii.     New Mexico Board of Dental Health Care v. Gardner, Appeal No. A-1-CA-38406, Court of Appeals of the State of New Mexico (appealing the order enforcing compliance with the Dental Board's subpoena and investigation in D-202-CV-2018-08379).

## PROCEDURAL HISTORY

On January 6, 2021, Dr. Gardner filed the Complaint, asserting one cause of action.  See Complaint at 1. Dr. Gardner contends that the Defendants' decision to revoke his license to practice

dentistry violates his right to due process under the Fourteenth Amendment to the Constitution of the United States of America, because (i) the Defendants have relied on evidence destroyed by Delta Dental to revoke Dr. Gardner's license, depriving him of his "right to confront and cross-examine his accuser and examine evidence," Complaint ¶ 20, at 4; and (ii) the Defendants are the "beneficiar[ies] of a lucrative contractual relationship with" Delta Dental, depriving him of his procedural due process right to an impartial decision-maker, Complaint ¶ 21, at 4.  Dr. Gardner requests, therefore, that the Court grant "a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting the Defendants from revoking Plaintiff's professional license pursuant to 42 U.S.C. §1983."  Complaint ¶ 23, at 4.

1.    **The Motion.**

Dr. Gardner filed the Motion on January 4, 2021, seeking a TRO "enjoining the Defendants and all those in active concert or participation with them from taking any action that would limit, suspend, or revoke Plaintiff's license to practice dentistry in the State of New Mexico pending a hearing on and determination of Plaintiff's Motion for Preliminary Injunction filed herewith." Motion ¶ 1, at 1.  Dr. Gardner argues that he is likely to succeed on the merits of his procedural due process claim, because "[t]here does not appear to be any significant dispute regarding the facts . . . ." Motion ¶ 3, at 1-2.  As background, Dr. Gardner alleges that Delta Dental filed a

complaint[4] seeking the revocation of Plaintiff's license to practice dentistry claiming that Plaintiff had improperly altered a dental x-ray in an effort to fraudulently obtain insurance payments from Delta Dental.  Delta Dental was

---

[4]Gardner alleges that "Delta Dental filed the instant complaint," but does not attach or otherwise explain to what the "instant complaint" refers.  Motion ¶ 3, at 2.  The Court took judicial notice of the Insurance Fraud Complaint in its findings of fact.  See Findings of Fact ¶¶ 16-19, supra.

- 19 -

unable to produce a copy of the allegedly altered dental x-ray because Delta Dental had knowingly destroyed the x-ray at issue.

Motion ¶ 3, at 2. Dr. Gardner contends that

the Defendants' attempted revocation of Plaintiff's license to practice based on physical evidence that [Delta Dental] had unilaterally destroyed, deprived Plaintiff of his 14th Amendment right to due process by denying him a meaningful right to confront and cross-examine his accuser and denying his right to examine and respond to documentary evidence.

Motion ¶ 3, at 2 (citing Greene v. McElroy, 360 U.S. 474, 496-97 (1959); Goldberg v. Kelly, 397 U.S. 254, 270 (1970); Black v. Romano, 471 U.S. 606, 612 (1985)). Dr. Gardner also alleges that, because the Defendants have a "material financial conflict of interest with the complainant, Delta Dental," the Defendants deprived him of "a non-neutral decision-maker." TRO at ¶ 3, at 2 (citing Goldberg v. Kelly, 397 U.S. at 271 ("[A]n impartial decision maker is essential."); Black v. Romano, 471 U.S. at 612). Dr. Gardner argues, without citation to case law, that he has a property interest in his license to practice dentistry. See Motion ¶ 5, at 2-3.

Dr. Gardner contends that it "will not harm Defendants" if he is allowed to continue to practice dentistry, because the "Defendants have no legitimate interest in preventing capable and qualified dentists from providing services to the public. There is no evidence to support a finding that Plaintiff mistreated a patient or failed to live up to the standards of his profession." Motion ¶ 6, at 3. Dr. Gardner contends that a TRO will not cause financial damage to the Defendants. See Motion ¶ 9, at 3. Dr. Gardner argues that "the injury to Plaintiff resulting from the Defendants' revocation of Plaintiff's license to practice dentistry far outweighs the damage to Defendants from issuance of injunctive relief." Motion ¶ 8, at 3.

2.      **The Hearing**.

The Court held a hearing on the TRO on January 6, 2021.  See Clerk's Minutes at 1, filed January 6, 2021 (Doc. 8).  The Court began the hearing by addressing a prior interaction the Court had with Dr. Gardner.  See Transcript of Hearing at 2:20-4:4 (taken January 6, 2021)(Court)("Tr.").[5]  Neither party stated the Court's prior interaction with Dr. Gardner raised any conflicts or the need for the Court to recuse.  See Tr. at 4:2-5 (Court, Joe, Boyle).  The Court stated that it had read the complaint, the motion for temporary restraining order, and the motion for preliminary injunction and asked counsel for the Defendants their position on the request for a TRO.  See Tr. at 4:6-14 (Court).  The Defendants informed the court that they are opposing the motion for the temporary restraining order.  See Tr. at 5:2-4 (Joe).  The Court then asked parties about any impending circumstances Dr. Gardner was facing that may have created this emergency.  See Tr. at 5:16-22 (Court).  Dr. Gardner responded stating there was nothing impending and the reason for filing the temporary restraining order was to get through the state court proceeding before seeking the Court's assistance.  See Tr. at 5:23-6:3 (Boyle).  The Court asked for more information regarding the state proceedings, stating that, from the Court's understanding, Dr. Gardner has remedies through the state court system and the Court does not have the ability to be the appeals court for state court proceedings.  See Tr. at 6:10-18 (Court).  The Court then asked

_____

[5]The Court's citations to the transcripts of the hearing in this Memorandum Opinion and Order refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

parties what the problems are with the state remedies.  See Tr. at 6:19-20 (Court).  Dr. Gardner

addressed what the problem with the state remedies:

> Dr. Gardner filed an appeal of the revocation with the state in district court,
> as the rules provide for, due to the ineffective assistance his counsel at the time.
> That proceeding was dismissed.  That appeal proceeding was dismissed without
> any determination of the merits.  And upon that event happening is when we began
> to try and understand what we could do to address these particular rights that we're
> talking about.

Tr. at 6:23-7:6 (Boyle).  Dr. Gardner then explained to the Court that the foundation of his claim

is the argument that the members of the Dental Board had a conflict of interest with Delta Dental,

the author of the Insurance Fraud Complaint, thus Dr. Gardner was deprived of his right to a neutral

decision maker in the revocation proceeding.  See Tr. 7:8-13 (Boyle).  Dr. Gardner then stated,

because of the unconstitutional Dental Board, the Court would not be acting as a court of appeals

but rather would be acting to assure the § 1983 rights that Dr. Gardner has under the Fourteenth

Amendment.  See Tr. at 7:19-23 (Boyle).

The Defendants responded that the temporary restraining order would be ineffective as Dr.

Gardner had his license previously revoked by the Dental Board and does not currently have a

license to practice dentistry so it is unclear how the temporary restraining order would have an

impact.  See Tr.at 8:5-10 (Joe).  Additionally, the Defendants noted a second action taken by the

Dental Board on Dr. Gardner's license that would still be in effect in the present case.  See Tr.

8:14-16 (Joe).  The Court then asked the Defendants, had Dr. Gardner not pursued a claim in

federal court, what would his remedy be?  See Tr. at 8:17-21 (Court).  The Defendants responded

by noting the numerous appeals Dr. Gardner had filed during or before the disciplinary process,

which include an August 16, 2019, filing in New Mexico District Court before the Dental Board

filing their decision, a subsequent filing in that action appealing the dental board's decision,  a July

2020 filing in New Mexico Supreme Court seeking an emergency stay, and a July 24, 2020 filing in the New Mexico Court of Appeals for an emergency stay about the proceedings at the district court about the appeal and the revocation of his license.  See Tr. at 8:23-9:14 (Joe).  The Defendants concluded, "So we believe he's exhausted all of the state remedies and has now been seeking the assistance of the federal court to try to rectify."  Tr. at 9:24-10:1 (Joe).  The Defendants then noted another complaint before the Dental Board, which resulted in a default order, and a second proceeding, separate and apart from the current TRO, that had revoked the license of Dr. Gardner. See Tr. at 10:6-12 (Joe).  Additionally, the Defendants stated that because Dr. Gardner's license had been revoked since July of 2020, the standard of being an irreparable harm has not been met and the injury is not an imminent injury.  See Tr. at 10:16-21 (Joe).

Dr. Gardner responded that they were unaware of the second complaint and stated they were not in a position to argue its relevancy.  See Tr. at 11:1-4 (Boyle).  Addressing the immediate risk of harm, Dr. Gardner noted that, because of a procedural error by prior counsel in July, the state court acted to completely deny any relief.  See Tr. at 11:5-8 (Boyle).  Dr. Gardner continued by stating a motion to reconsider was filed in November, which the trial court denied, leaving Dr. Gardner without a remedy.  See Tr. at 8-12 (Boyle).  Dr. Gardner concluded by stating:

> The defendants haven't argued there is any harm to them.  So I think it's pretty clear that Dr. Gardner satisfies the two prongs that asks the Court to weigh the harm to the plaintiff against the potential harm to the defendants.  And I would simply add that with respect to the merits, this is an unusual case I believe because there doesn't appear to be any serious dispute that the decision makers here, the defendants, were not neutral parties or with the particular piece of evidence with which Dr. Gardner was entitled to be confronted had been destroyed by the complaint. Both of those things according to the cases that we citied in our motion are, in fact, denial of Dr. Gardner's due process rights.

Tr. at 11:18-12:7 (Boyle).

**LAW REGARDING REQUESTS FOR A TEMPORARY RESTRAINING ORDER**

The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  The Supreme Court and the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a TRO under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  A moving party must "establish that he is likely to succeed

- 24 -

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm. Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor. Diné, 839 F.3d at 1282. Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States and its

officers and agencies are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court

must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co.,

825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate

the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See

also Flood v. ClearOne Comm'ns, 618 F.3d 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth

Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and

may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d at 1215

(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Court has written several times on the topic of TROs and preliminary injunctions.  In

O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239 (D.N.M.

2017)(Browning, J.), the Court issued a preliminary injunction requiring the United States Citizen

and Immigration Services ("USCIS") to reconsider the I-129 nonimmigrant R-1 petition to a

religious minister to the O Centro Espirita Beneficiente Uniao Do De Vegetal Christian spiritualist

religious organization ("UDV").  O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke, 286

F. Supp. 3d at 1269.  The Court issued that relief, in part, because it was substantially likely that

the USCIS' first denial of the minister's R-1 petition violated the Religious Freedom Restoration

Act, 42 U.S.C. § 2000bb-1 ("RFRA").  See O Centro Espirita Beneficiente Uniao Do Vegetal v.

Duke, 286 F. Supp. 3d at 1263-64.  The USCIS had denied the petition, because the minister made

no money and because the minister was not part of an established missionary program.  See 286

F. Supp. 3d at 1264.  UDV theology precluded its ministers from making money, and an

established missionary program requires that at least one religious worker, at some point, be

compensated.  See 286 F. Supp. 3d at 1264.  The Court reasoned, accordingly, that DHS had substantially burdened the minister's right to exercise his religion, because, in effect, the R-1 petition review required the minister to make money to preach his liturgy in the United States, even though his religion forbade him from making money.  See 286 F. Supp. 3d at 1264.  The minister also met a preliminary injunction's other three prongs, so the Court granted the relief requested.  See 286 F. Supp. 3d at 1265-66.

The Court has also issued a TRO, prohibiting the Santa Fe Public Schools from suspicionless pat-down searches of its students before prom and graduation.  See Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1200.  It concluded that: (i) a violation of the Fourth Amendment of the Constitution of the United States "standing alone" constitutes irreparable injury; (ii) suspicionless pat-down searches involving "touching of students' bodies," including "cupping and shaking girls' breasts," were unreasonably and unconstitutionally intrusive, even if those type of searches were likely effective in apprehending students with drugs, weapons, alcohol, or "distracting contraband"; (iii) the threatened injury outweighed the TRO's damage; and (iv) the TRO was not adverse to the public, because it would protect other students' constitutional rights who attended prom and graduation.  Herrera v. Santa Fe Pub. Schs., 792 F. Supp. 2d at 1194-98. The Court denied a request for injunctive relief in Salazar v. San Juan County Detention Center, No. CIV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016)(Browning, J.), after concluding that, although the defendants faced irreparable harm, the balance of equities favored them, and an injunction was not adverse to the public interest, the plaintiffs were unlikely to succeed on the merits.  See Salazar v. San Juan Cty. Detention Ctr., 2016 WL 335447, at *43-52.

## LAW REGARDING PRELIMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the moving party must establish that: (i) "[it] will suffer irreparable injury unless the injunction issues"; (ii) "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) "the injunction, if issued, would not be adverse to the public interest"; and (iv) "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter, 555 U.S. 7, 19 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008)). The movant bears the burden of demonstrating that those equitable factors weigh in its favor. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'" Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). The Tenth Circuit has identified the following three specifically disfavored preliminary

injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004)(en banc)("O Centro Espirita"), aff'd on other grounds, 546 U.S. 418 (2006))(internal quotation marks omitted). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro Espirita, 389 F.3d at 975). With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation marks omitted).

    "[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enter., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING YOUNGER ABSTENTION

Under the abstention doctrine that the Supreme Court articulated in Younger v. Harris, 401 U.S. 37 (1971)("Younger"), "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999)). Younger abstention is not a doctrine only belonging to courts of equity, although the doctrine arose from parties seeking equitable relief from state court proceedings in federal court. The Tenth Circuit has "not treated abstention as a 'technical rule of equity procedure,' [r]ather, [it has] recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief." Morrow v. Winslow, 94 F.3d 1386, 1392 (10th Cir. 1996)(quoting Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996)). This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs." J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999)(quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)).

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three elements must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)("Middlesex")); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001). When all of the

elements mandating abstention clearly exist in the record, courts may and should address application of the Younger abstention doctrine sua sponte.  See Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(stating that "abstention may be raised by the court sua sponte"); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996)(raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

"Younger abstention is not discretionary once the [three] conditions are met, absent extraordinary circumstances that render a state court unable to give state litigants a full and fair hearing on their federal claims."  Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d 709, 711 (10th Cir. 1989)(citation omitted).  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise.").  When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation.  Deakins v. Monaghan, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  See also Younger, 401 U.S. at

43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a state court can address a plaintiff's causes of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the state court proceeding.  In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  See 242 F. App'x at 613.[6]  The parent had requested a federal district court to issue an order regarding his parental rights and rights to child support payments, and to award the parent monetary damages recompensing him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado state trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the state court officials adjudicating his state custody case.  242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the

---

[6]Wideman v. Colorado is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), and the other published opinions cited herein, have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

parent's case under <u>Younger</u>.  <u>See</u> <u>Wideman v. Colorado</u>, 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigant any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the <u>Younger</u> abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while state proceedings are ongoing.

### LAW REGARDING COLORADO RIVER ABSTENTION

In <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976)("<u>Colorado River</u>"), the Supreme Court announced an abstention doctrine under which a federal court may, in exceptional circumstances, dismiss a federal suit "due to the presence of a concurrent state proceeding for reasons of wise judicial administration."  <u>Colorado River</u> , 424 U.S. at 817-18.  The Supreme Court reviewed a district court's decision to dismiss an action that the United States brought in deference to an ongoing state court proceeding.  <u>See</u> 424 U.S. at 805-06.  The United States sought a declaration of its water rights, the appointment of a water master, and injunctive relief.  <u>See</u> 424 U.S. at 284.  The Tenth Circuit reversed the district court, holding that the suit was within the district court's jurisdiction and that abstention was inappropriate.  <u>See</u> 424 U.S. at 814-19. In overturning the Tenth Circuit and affirming the district court's determination, the Supreme Court articulated several factors that district courts should consider in assessing whether to grant dismissals or stays in instances where similar issues are being

concurrently litigated in state and federal courts.  See 424 U.S. at 814-19.  Those factors are:  (i) whether the questions before the court present difficult questions of state law, are governed by state as opposed to federal law,[7] or bear on policy problems of substantial import to the state; (ii) whether principles of wise judicial administration and economy suggest deferring to the state courts; (iii) which court first assumed jurisdiction over any property at issue; (iv) whether the federal forum is less convenient; (v) whether allowing the matter to go forward in state court would avoid  piecemeal litigation; and (vi) in which order jurisdiction was obtained by the concurrent forums.  See Colorado River, 424 U.S. at 814-19; Burford v. Sun Oil Co., 319 U.S. 315 (1943).  A finding of parallel proceedings is a threshold condition for engaging in the Colorado River analysis.  See Fox v. Maulding, 16 F.3d 1079, 1081 (10th Cir. 1994).  Even in the Colorado River abstention context, however, exact identity of parties and issues is not required.  Rather, state and federal proceedings are sufficiently parallel if "substantially the same parties litigate substantially the same issues."  Fox v. Maulding, 16 F.3d at 1081 (quotation omitted).

In applying the factors set forth in Colorado River, the Supreme Court in Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983), stated: "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." 460 U.S. at 15-16.  Addressing the factor concerning in which order jurisdiction was obtained, the Supreme Court asserted that:

---

[7]This factor's development can be traced from Colorado River, 424 U.S. at 825-26, to Will v. Calvert Fire Ins. Co., 437 U.S. 655, 667, 668-77 (1978), and on to Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 (1983).

> This factor, as with the other <u>Colorado River</u> factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. <u>Colorado River</u> illustrates this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss.

<u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 21-22 (internal quotation omitted).

District courts may only stay or dismiss such actions when "extraordinary circumstances," as established by a weighing of the factors laid out in <u>Colorado River</u>, warrant. <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 14-15. "Colorado River abstention is based on the policy of conserving judicial resources in situations involving the contemporaneous exercise of concurrent jurisdictions." <u>Grimes v. Crown Life Ins. Co.</u>, 857 F.2d 699, 707 (10th Cir. 1988). Highlighting the distinction between the <u>Colorado River</u> abstention doctrine and the abstention doctrine in <u>Brillhart v. Excess Insurance Co. of America</u>, 316 U.S. 491 (1942), the United States Court of Appeals for the Fifth Circuit, in a case contained within a string of cases to which the Tenth Circuit has cited favorably, has held:

> <u>Brillhart</u> abstention is applicable "when a district court is considering abstaining from exercising jurisdiction over a declaratory judgment action. In contrast, when actions involve coercive relief the trial court must apply the standards enunciated by the Court in <u>Colorado River</u>. . . ." When a party seeks both injunctive and declaratory relief, the appropriateness of abstention must be assessed according to the doctrine of <u>Colorado River</u>; the only potential exception to this general rule arises when a party's request for injunctive relief is either frivolous or is made solely to avoid application of the <u>Brillhart</u> standard.

Black Sea Inv., Ltd., v. United Heritage Corp., 204 F.3d 647, 652 (5th Cir. 2000).  See United

States v. Las Cruces, 289 F.3d 1170, 1181-82 (10th Cir. 2002)(stating that, "in a suit seeking

coercive relief as well as declaratory relief, [the] broad Brillhart standard [is] inappropriate.").

In Moses H. Cone Memorial Hospital v. Mercury Construction Corp., the defendant moved

for an order compelling arbitration under 9 U.S.C. § 4.  See 460 U.S. at 4.  The district court

applied the Colorado River abstention doctrine and stayed the diversity action pending resolution

of a pending concurrent state-court action.  The United States Court of Appeals for the Fourth

Circuit reversed the stay order, and the Supreme Court affirmed the Fourth Circuit's reversal.

Applying the Colorado River factors, Justice Brennan, writing for the majority, wrote:

> [I]t is clear that there was no showing of the requisite exceptional circumstances to
> justify the District Court's stay.  The Hospital concedes that the first two factors
> mentioned in Colorado River are not present here.  There was no assumption by
> either court of jurisdiction over any res or property, nor is there any contention that
> the federal forum was any less convenient to the parties than the state forum.  The
> remaining factors -- avoidance of piecemeal litigation, and the order in which
> jurisdiction was obtained by the concurrent forums -- far from supporting the stay,
> actually counsel against it.

Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. at 18.  The Supreme

Court found that there was not piecemeal litigation because "[a]lthough the Hospital will have to

litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from

the merits of the underlying disputes."  460 U.S. at 20.  The Hospital argued that the federal-court

stay was proper because the state court suit was filed nineteen days before the federal suit.  The

Supreme Court found that this did not necessarily favor abstention in the unique circumstance.

The plaintiff filed its cause of action for an arbitration order because the Hospital refused to

arbitrate, but the Hospital did not refuse until less than a day before the Hospital filed its state suit,

and thus the plaintiff had no reasonable opportunity to file its § 4 petition first.  See 460 U.S. at

21.  The Supreme Court also expressed concern over the "probable inadequacy of the state-court

proceeding to protect Mercury's rights."  460 U.S. at 26.  Justice Brennan explained:

> In many cases, no doubt, a § 3 stay is quite adequate to protect the right to
> arbitration.  But in a case such as this, where the party opposing arbitration is the
> one from whom payment or performance is sought, a stay of litigation alone is not
> enough.  It leaves the recalcitrant party free to sit and do nothing -- neither to litigate
> nor to arbitrate.  If the state court stayed litigation pending arbitration but declined
> to compel the Hospital to arbitrate, Mercury would have no sure way to proceed
> with its claims except to return to federal court to obtain a § 4 order -- a pointless
> and wasteful burden on the supposedly summary and speedy procedures prescribed
> by the Arbitration Act.

460 U.S. at 27.

In Nationstar Mortgage, LLC v. Knox, 351 F. App'x 844 (5th Cir. 2009), the Fifth Circuit

reviewed the district court's decision to decline jurisdiction and deny a motion to compel

arbitration because there was a pending state-court proceeding.  See 351 F. App'x at 847.  The

Fifth Circuit, on appeal, stated: "[F]or purposes of judicial efficiency, although the district court

did not expressly rely on the Colorado River abstention doctrine, we may consider *sua sponte*

whether the requirements of Colorado River are met."  Nationstar Mortgage, LLC v. Knox, 351 F.

App'x at 851.  The Fifth Circuit concluded that the first two Colorado River factors were not

present and determined that the third factor -- the possibility of piecemeal litigation -- counseled

against abstention because "[a]llowing a federal court to order arbitration, even where a state court

may construe an arbitration clause differently, is fully consistent with [] established congressional

intent."  Nationstar Mortgage, LLC v. Knox, 351 F. App'x at 851-52 (quoting Brown v. Pac. Life

Ins. Co., 462 F.3d 384, 396 (5th Cir. 2006)).  The Fifth Circuit also concluded that the fifth

factor -- the extent to which federal law provides the rules of decision on the merits -- favored

federal jurisdiction because, although the Knoxes' claims in state court were based on state law, the Federal Arbitration Act governed the merits of the federal action.  See 351 F. App'x at 852. The Fifth Circuit concluded, however, that the fourth factor -- the order in which the forums obtained jurisdiction -- favored abstention: the state action was filed first, and, although arbitrability, was not asserted in state court, Nationstar Mortgage could have done so and still could do so, whereas the merits of the federal action had not been reached.  See 351 F. App'x at 852. The Fifth Circuit also concluded that the sixth factor -- the adequacy of the state proceedings in protecting the rights of the party invoking diversity jurisdiction -- weighed in favor of abstention. See 351 F. App'x at 852 ("Needless to say, we have no reason to doubt the adequacy of the state court's ability to resolve arbitrability issues.").  After considering the factors and determining that two factors were neutral, two favored abstention, and two counseled against it, the Fifth Circuit concluded that the district court did not abuse its discretion in abstaining:

> We are fully cognizant of the "national policy in favor of arbitration."  Brown, 462 F.3d at 396.  For reasons of "[w]ise judicial administration," Colo. River, 424 U.S. at 817, however, abstention was not improper.  As discussed, this diversity action is governed by state law (except, of course, the arbitrability issue); the state court is subject to, and can likewise apply, the FAA; and the merits of the parties' dispute have not been reached in either the state or the federal action.

Nationstar Mortgage, LLC v. Knox, 351 F. App'x at 852.

## LAW REGARDING THE ROOKER-FELDMAN DOCTRINE

The Rooker-Feldman doctrine embodies the principle that federal district courts may not serve as courts of appeal for state courts.  See Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning, J.).  Review of a state's highest court judgments is within the Supreme Court of the United States' exclusive jurisdiction.

See D.C. Ct. App. v. Feldman, 460 U.S. 462, 476 (1983); Bolden v. City of Topeka, 441 F.3d 1129, 1140 (10th Cir. 2006). See also 28 U.S.C. § 1257 (establishing review by Supreme Court of final judgments of highest court of a state).  A district court has no jurisdiction over a matter in which:  "(i) a state-court loser; (ii) is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) [the state court] judgment was rendered before the commencement of the federal proceeding."  Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *38 (citing Guttman v. Khalsa, 446 F.3d 1027, 1032 (10th Cir. 2006)).

Although Rooker-Feldman, with its four elements, appears to be a straight-forward principle, the application of the doctrine can be complex.  For example, a challenge to a state court judgment is "barred even if the claim forming the basis of the challenge was not raised in the state proceedings," yet "Rooker-Feldman does not bar a federal-court suit raising a claim  previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply contradict, the state-court judgment."  Bolden v. City of Topeka, 441 F.3d at 1141, 1144.  The Tenth Circuit has reconciled these principles by concluding that the scope of Rooker-Feldman is "confined to the cases of the kind . . . brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Bolden v. City of Topeka, 441 F.3d at 1142-43 (citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 282 (2005)).  Thus, an essential characteristic of a suit barred under Rooker-Feldman is that the "loser in state court invites [a] federal district court to overturn [a] state court judgment."  Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. at 287 n.2.  Conversely, Rooker-Feldman does not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or

judgment." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1145.[8] Thus, where a plaintiff does not put the

state court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject

matter, or even the same claims, as those presented in the state-court action." <u>Bolden v. City of</u>

<u>Topeka</u>, 441 F.3d at 1139.[9]

The Tenth Circuit's application of the <u>Rooker-Feldman</u> doctrine elucidates the opaque

distinction between claims that <u>Rooker-Feldman</u> bars, and those claims that allege the same cause

of action asserted in the state court, but are not barred. The Tenth Circuit provided an example of

this distinction in a hypothetical child-custody case in <u>Bolden v. City of Topeka</u>. <u>See</u> 441 F.3d at

1129. The Tenth Circuit explained that a father, who lost custody of his child in a state court

judgment, could not then bring suit in federal court alleging that the state court judgment was

---

[8]The Court has previously discussed the relation of <u>Rooker-Feldman</u> and <u>Younger v.</u> <u>Harris</u>, 401 U.S. 37 (1971). <u>See</u> <u>F.D.I.C. v. Harger</u>, 778 F. Supp. 2d 1123, 1135 n.6 (D.N.M. 2011)(Browning, J.). In brief, whereas <u>Rooker-Feldman</u> bars a federal district court from reviewing state court judgments which are final, <u>Younger v. Harris</u> "prevents the federal district court from interfering in an ongoing state proceeding." <u>F.D.I.C. v. Harger</u>, 778 F. Supp. 2d at 1135, n.6. Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a state court judgment is final nor pray for relief from a state court judgment once it becomes final. <u>See</u> <u>Martinez v. Martinez</u>, No. CIV 09-0281 JB/LFG, 2013 WL 3270488, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).

[9]The doctrine of res judicata may bar a complaint that <u>Rooker-Feldman</u> does not. <u>Rooker-</u> <u>Feldman</u> is related to the principle that federal courts possess only original jurisdiction. <u>See</u> <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. at 416 ("Under the legislation of Congress, no court of the United States other than this court could entertain a proceeding to reverse or modify the [state court] judgment . . . . To do so would be an exercise of appellate jurisdiction. The jurisdiction possessed by the [federal] District Courts is strictly original."); <u>Bolden v. City of Topeka</u>, 441 F.3d at 1145 (discussing that, where <u>Rooker-Feldman</u> is not a bar, "[a] myriad of doctrines, including res judicata, would almost certainly bar the suit" which was brought after a state court judgment adverse to the plaintiff). <u>See also</u> <u>Campbell v. City of Spencer</u>, 682 F.3d 1278, 1283 (10th Cir. 2012)("<u>Rooker-Feldman</u> does not . . . override or supplant preclusion doctrine.")(citing <u>Exxon</u> <u>Mobil v. Saudi Basic Indus. Corp.</u>, 544 U.S. at 282).

invalid.  See 441 F.3d at 1129.  The father would be barred even if his claims in federal court were different from those in state court; were the father, perhaps, to argue that the state court judgment deprived him of due process or was contrary to federal law on other grounds, Rooker-Feldman would bar such an action.  Bolden v. City of Topeka, 441 F.3d at 1129.  Rooker-Feldman would not, however, bar the father from seeking custody of his child in federal court, so long as the father's complaint did not raise any allegations regarding the state court judgment specifically. Bolden v. City of Topeka, 441 F.3d at 1145.

        The Tenth Circuit in Bolden v. City of Topeka ruled that a district court was wrong to bar a plaintiff's suit under Rooker-Feldman where the plaintiff "did not seek to overturn the state-court judgment."  441 F.3d at 1138.  The City of Topeka notified the plaintiff in Bolden v. City of Topeka that several properties he owned failed to meet housing code regulations and thus would be demolished.  See 441 F.3d at 1131-32.  The plaintiff initially sought to enjoin the destruction of his buildings in state court, and the state court denied his request.  See 441 F.3d at 1131-32. The plaintiff then filed suit in federal district court, once again seeking to enjoin the destruction of his buildings.  See 441 F.3d at 1131-32.  His federal suit did not address the validity of the state court judgment or argue that federal court should override, on any grounds, the state court judgment denying his requested injunction.  See 441 F.3d at 1132.  The district court dismissed his request for an injunction under Rooker-Feldman, but the Tenth Circuit concluded that the district court misapplied the doctrine.  See Bolden v. City of Topeka, 441 F.3d at 1132, 1138.  The Tenth Circuit focused on the plaintiff's claims in federal court being "identical to what they would have been had there been no state-court proceeding."  Bolden v. City of Topeka, 441 F.3d at 1138. Because the plaintiff did not argue that the "judgment itself inflicted an injury," Rooker-Feldman

did not bar the plaintiff's claims alleging violations against the city's action of destroying his buildings.  Bolden v. City of Topeka, 441 F.3d at 1138, 1145.  Rooker-Feldman did not apply, because the plaintiff's claims "would be identical even had there been no state court judgment." Bolden v. City of Topeka, 441 F.3d at 1145.

Similarly, the Tenth Circuit has endorsed the logic of Nesses v. Shepard, 68 F.3d 1003 (7th Cir. 1995)( Posner, J.), wherein the United States Court of Appeals for the Seventh Circuit found that Rooker-Feldman does not apply to a party's claims that do not request relief from a state-court judgment.  See Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(quoting Nesses v. Shepard, 68 F.3d at 1005).  In Nesses v. Shepard, the plaintiff suffered several losses in state court before suing the lawyers and judges involved in those state court proceedings in federal court.  See 68 F.3d at 1004.  He "allege[d] a massive, tentacular conspiracy among the lawyers and the judges to engineer [his] defeat" in the state court suits.  Nesses v. Shepard, 68 F.3d at 1004.  The federal district court dismissed the federal case for want of jurisdiction on the basis of the Rooker-Feldman doctrine.  See Nesses v. Shepard, 68 F.3d at 1004.  On appeal, the Seventh Circuit held that Rooker-Feldman did not apply.  Nesses v. Shepard, 68 F.3d at 1005. The Honorable Richard Posner, United States Circuit Judge for the Seventh Circuit, explained:

> [The Rooker-Feldman doctrine] is not that broad. Were [a plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim.  But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm. Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment.

Nesses v. Shepard, 68 F.3d at 1005 (internal citation omitted).  Judge Posner distinguished the case

from one Rooker-Feldman bars by pointing out that, although the plaintiff "was in a sense attacking

the ruling by the state court," by asserting that he lost in state-court because the "lawyers and the

judges [engineered the plaintiff's] defeat," the plaintiff was not "seeking to undo a remedial order

of some sort."  68 F.3d at 1005.

   The Tenth Circuit has barred a plaintiff's due process claims against a city, under Rooker-

Feldman, where the alleged violations occurred because of a state court's order.  See Campbell v.

City of Spencer, 682 F.3d, 1278, 1284 (10th Cir. 2012).  In Campbell v. City of Spencer, a plaintiff

filed suit in federal court, alleging, among other claims, that the City of Spencer violated her due-

process and Eighth Amendment rights by seizing her horses and imposing an "excessive fine"

pursuant to a state court order.  682 F.3d at 1280.  The federal court dismissed her due-process

allegations, finding that Rooker-Feldman barred the claims.  682 F.3d at 1280.  The Tenth Circuit

agreed.  Because the plaintiff's "deprivation of property . . . allegedly without just compensation

or due process was the deprivation ordered by the state court . . . [her] claim [had] merit only if

the state court forfeiture order was unlawful on the record before the court."  682 F.3d at 1284.

The plaintiff's suit was a "direct attack on the state court's judgment because an element of [her]

claim [was] that the judgment was wrongful."  682 F.3d at 1284.  "The alleged constitutional

wrong was the content of the judgment . . . not . . . some act by a defendant that led to the

judgment."  682 F.3d at 1285.  Thus, Rooker-Feldman barred the plaintiff's claims, because the

harm the plaintiff alleged would not have occurred but-for the state court judgment.  682 F.3d at

1285-86.

Moreover, the Supreme Court has held that the <u>Rooker-Feldman</u> doctrine "has no application to judicial review of executive action, including determinations made by a state administrative agency." <u>Verizon Md., Inc. v. Public Servs.' Comm'n of Md.</u>, 535 U.S. at 644 n. 3. The Tenth Circuit held that the <u>Rooker-Feldman</u> doctrine does not apply to determinations made by a property valuations protest board, whose authority was defined under New Mexico statute. <u>See</u> <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d 1202, 1206 (10th Cir. 2006). In so holding, the Tenth Circuit reasoned that "<u>Rooker-Feldman</u> does not apply to judicial review of state agency decisions." <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d at 1207-08.

## **LAW REGARDING 42 U.S.C. § 1983 CLAIMS**

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. <u>See</u> <u>Nelson v. Geringer</u>, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by <u>Nelson v. Geringer</u>)(quoting <u>Ellis v. Univ. of Kan. Med. Ctr.</u>, 163 F.3d 1186, 1197 (10th Cir. 1998))). Section 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. <u>See</u> 42 U.S.C. § 1983. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the

plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).

The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused
> (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M.

2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-

0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court clarified that, in alleging a § 1983 action against a government agent

in his or her individual capacity, "a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal,

556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See

Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[10] and

§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S.

397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-

employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of

---

[10]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389. Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

N.Y., 436 U.S. 658, 689 (1978). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006). The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)). The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676. The Tenth Circuit in Dodds v. Richardson stated:

> Whatever else can be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199 (quoting 42 U.S.C. § 1983). The Tenth Circuit has noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this

- 46 -

circuit in ways we do not need to address to resolve this case." Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "'crush the nascent labor organizations.'" Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment of the United States of America states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136

(D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry for determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience.'" Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given

- 48 -

some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme

Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men.  In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.  "The Fourteenth Amendment's procedural

protection of property is a safeguard of the security of interests that a person has already acquired

in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property

interests, as already explained, clearly can include "real estate, chattels, or money," but they "may

take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it.  He must have more than a unilateral

expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents

of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

 "[O]nce it is determined that the Due Process Clause applies, the question remains what process is due."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. at 334.  The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee

who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  Hamdi v. Rumsfeld, 542 U.S. 507, [529] (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing

- 51 -

until after the event").

The Court has previously considered procedural due process violations several times.  See

e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL

13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").   For example, in

Youngers, the Court concluded that the New Mexico Department of Health violated due process

when it afforded a woman with developmental disabilities no process before depriving her of

medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it

afforded her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court

also has concluded that a tenured city employee was not denied due process when the city fired

him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d

1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily

guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215

(denying due process claims where a state employee "got her opportunity to be heard at a complex

grievance hearing, with an attorney and with an opportunity to question witnesses, and make

opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque,

375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of

Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its

inspectors, may close a restaurant to protect the health of patrons and workers without first

providing a hearing to the restaurant owner.").

More recently, in Lee v. Univ. of New Mexico, 449 F. Supp. 3d 1071, 1122 (D.N.M.

2020)(Browning, J.)("Lee I"), the Court, on a motion to dismiss, concluded that a student had

alleged facts sufficient to state a procedural due process against the University of New Mexico

based on the procedures the university used in its sexual misconduct investigation.  The Court

concluded that a student has a property interest in his or her continued enrollment at a university,

but the student did not have a liberty interest in his reputation, where the student did not allege that

false statements were publicized.  See Lee I, 449 F. Supp. 3d at 1122.  The Court explained that,

under Supreme Court and Tenth Circuit precedent, "'a student's legitimate entitlement to a public

education as a property interest . . . is protected by the Due Process Clause,'" Lee I, 449 F. Supp.

3d at 1122 (quoting Gaspar v. Bruton, 513 F.2d 843, 850 (10th Cir. 1975)), but that

> damage to "reputation alone, apart from some more tangible interest such as
> employment," is insufficient to invoke the Due Process Clause's protections.  Paul
> v. Davis, 424 U.S. 693, 701 (1976).  Instead, a plaintiff "must show that as a result
> of the defamation, 'a right or status previously recognized by state law was
> distinctly altered or extinguished.'"  Al-Turki v. Tomsic, 926 F.3d 610, 617 (10th
> Cir. 2019)(quoting Paul v. Davis, 424 U.S. at 711).  This is the "stigma-plus" claim
> sufficient to implicate a constitutionally-protected liberty interest.  See Gwinn v.
> Awmiller, 354 F.3d 1211, 1216, 1223-24 (10th Cir. 2004). The Tenth Circuit
> recognizes deprivation "of the right to attend school" as the sufficient "something
> more" to implicate the Due Process Clause.

Lee I, 449 F. Supp. 3d at 1122.  Based on the student's property interest in his continued education

at university and the university's "limited interest in not providing many of the procedural

safeguards" in a sexual assault investigation, the Court then concluded, under the Mathews v.

Eldridge, 424 U.S. at 335, balancing test, that the student's allegations that

> UNM's investigator made a determination against him without ever holding a
> formal hearing, and that he was not allowed to learn the witnesses' identities, attend
> any witness interviews, acquire the interview recordings, question witnesses
> regarding factual assertions, or get an opportunity to cross-examine . . . [were
> sufficient to] state[] a claim that UNM's hearing procedures do not comply with
> Due Process.

Lee I, 449 F. Supp. 3d at 1124.  Next, the Court addressed the issue of notice, and concluded that

(i) allegations that "UNM failed to inform [the student] that he faced expulsion" did not indicate a

risk of erroneous deprivation where "UNM had already informed [the student] that he was banned from campus"; (ii) UNM failed to provide the student with adequate notice that the university "would raise underage drinking claims at his sanctions hearing"; and (iii) UNM "heightened the risk of erroneous deprivation by informing [the student] that he could not bring in any new evidence at the sanctions hearing." Lee I, 449 F. Supp. 3d 1071, 1133-34 (citing Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1241 (10th Cir. 2001) and Mathews v. Eldridge, 424 U.S. at 349).

Subsequent to Lee I, in Lee v. Univ. of New Mexico, No. CIV 17-1230 JB/LF, 2020 WL 6743295, at *40 (D.N.M. Nov. 16, 2020)(Browning, J.)("Lee II"), the Court, on a motion for summary judgment, concluded that UNM did not violate the student's due process rights on several grounds.  First, the Court concluded that UNM afforded the student "'some kind of hearing,'" Lee II, 2020 WL 6743295, at *40 (quoting Goss v. Lopez, 419 U.S. 565, 584 (1975)), because (i) the Dean of Students "held an administrative hearing when it decided whether to expel" the student; (ii) "[a]t the administrative hearing, [the student] had 'the opportunity to present witnesses and evidence,' and have counsel present"; and (iii) at the hearing, a Student Conduct Officer with the Dean of Students "allowed [the student's] counsel to pass 'notes' and have 'whispered conversations' with [the student] during the hearing, although [the Student Conduct Officer] did not permit [the student's] counsel to 'make arguments on [the student's] behalf.'"  Lee II, 2020 WL 6743295, at *40 (quoting the evidentiary record).  Second, the Court concluded that "[s]tudents accused of violating university policy do not have an unfettered due process right to cross-examination in all disciplinary proceedings."  Lee II, 2020 WL 6743295, at *40 (citing cases).  The Court determined that, "despite [having a] substantial interest in his education,"

denying the student the right to cross-examine witnesses "creates little risk of erroneous deprivation," because the student had admitted to engaging in the alleged misconduct to the police after being Mirandized.[11]  Lee II, 2020 WL 6743295, at *40 (citing Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018)("[C]ross-examination is unnecessary if a student admits to engaging in misconduct," because "there is a little to be gained by subjecting witnesses to adversarial questioning when the accused student has already confessed.")).   The Court explained that, because the student had admitted to having non-consensual sexual contact with another student while the alleged victim was incapacitated, the witness' "credibility was not at issue" and allowing the student to cross-examine the witness "would be a 'fruitless exercise.'"  Lee II, 2020 WL 6743295, at *41 (quoting Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972)).  The Court also concluded that (i) the student was not entitled to a witness' identity, where the witness' statement "[did] not prejudice [the student] unfairly because that statement had virtually no impact on the

---

[11]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme Court of the United States provides the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

[UNM's] decision" to expel him; (ii) the student was not entitled to access all the evidence, because UNM gave him "detailed summaries of . . . the relevant evidence" and provided him an opportunity to respond to the witness' statements; (iii) UNM's decision-making process does not violate the student's due process rights, because the "inquisitorial model"[12] was not inherently biased; (iv) the university's application of the "preponderance-of-the-evidence standard" in student disciplinary proceedings did not violate the student's due process rights, because the Due Process Clause does not require universities to apply a higher evidentiary standard in student disciplinary proceedings; and (v) UNM did not violate the student's due process rights by considering provision of alcohol to a minor as a sanctions factor, because the Court determined that it would not "impose a higher notice requirement on the sanctioning stage of a university than it imposes at the sentencing phase of a criminal trial."  Lee II, 2020 WL 6743295, at *41-49.

## LAW REGARDING THE BEST EVIDENCE RULE

"The best evidence rule, set forth in Federal Rule of Evidence 1002, holds that 'to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.'"  United States v. Phillips, 543 F.3d 1197, 1203-04 (10th Cir. 2008)(quoting Fed. R. Evid. 1002).  Rule 1004 of the Federal Rules of Evidence provides for cases in which other evidence of the original's contents is admissible: An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:

---

[12]The "inquisitorial system" is a "system of proof-taking used in civil law, whereby the judge conducts the trial, determines what questions to ask, and defines the scope and the extent of the inquiry."  Inquisitorial System, Black's Law Dictionary (11th ed. 2019).

**(a)**     all the originals are lost or destroyed, and not by the proponent acting in bad faith;

**(b)**     an original cannot be obtained by any available judicial process;

**(c)**     the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or

**(d)**     the writing, recording, or photograph is not closely related to a controlling issue.

Fed. R. Evid. 1004 (bold in original). Professor Stephen A. Saltzburg has noted that "[r]ule 1004 recognizes that the Best Evidence Rule is a rule of preference, and not necessarily a rule of exclusion." 5 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, <u>Fed. Rules of Evidence Manual</u> § 1004.02, at 1004-2 (9th ed. 2006).

Before admitting secondary evidence regarding a writing, recording, or photograph under rule 1004(a), the district court must inquire: (i) whether the original was actually lost or destroyed; and (ii) whether the party offering the evidence of the original's contents has acted in bad faith. <u>See</u> <u>Cross v. United States</u>, 149 F.3d 1190, 1998 (10th Cir. 1998)(unpublished table opinion)("Rule 1004(1) thus requires the court to undertake two related inquiries before admitting secondary evidence regarding a document: (1) whether the document in question was actually lost or destroyed, and (2) whether the party offering the document has acted in bad faith.")(citing <u>United States v. McGaughey</u>, 977 F.2d 1067, 1071 (7th Cir. 1992); <u>Seiler v. Lucasfilm, Ltd.</u>, 613 F .Supp. 1253, 1260–62 (N.D. Cal. 1984), <u>aff'd</u>, 808 F.2d 1316 (9th Cir. 1986)). As to the inquiry's first prong, loss or destruction may commonly be proven by " 'use of evidence showing a diligent but unsuccessful search and inquiry for the [original],'" and, even if "the proponent is unable to explain with absolute certainty what happened to the original document," the district court may properly admit secondary evidence. <u>Cross v. United States</u>, 1998 WL 255054, at *5

(quoting <u>United States v. McGaughey</u>, 977 F.2d at 1071)(citing <u>United States v. Cambindo</u> <u>Valencia</u>, 609 F.2d 603, 633 (2d Cir. 1979)).  As to the inquiry's second prong -- negligent destruction of the original or the possibility that the proponent tampered with the secondary evidence is likely insufficient for bad faith -- "the purposeful destruction or withholding of original[s] . . . and the fabrication of secondary evidence will support a finding of bad faith." <u>Cross</u> <u>v. United States</u>, 1998 WL 255054, at *5 (citing <u>Seiler v. Lucasfilm, Ltd.</u>, 613 F. Supp. at 1255-63).

In <u>Cross v. United States</u>, the Tenth Circuit held that the court properly admitted secondary evidence to show that the plaintiffs, the Crosses, executed an Internal Revenue Service ("IRS") Form 870-AD, because the IRS presented evidence that "its officials have undertaken a diligent search for the Form 870-AD and have been unable to find it," and because the Crosses did not argue that the IRS acted in bad faith in relation to the original's loss or destruction. <u>Cross v. United</u> <u>States</u>, 1998 WL 255054, at *5.  The IRS had assessed the Crosses a deficiency on their income taxes from 1974-76 and 1979-80, and the Crosses reached agreement with the IRS as to the additional assessments that they would pay to the IRS.  See <u>Cross v. United States</u>, 1998 WL 255054, at *1.   The IRS appeals officer sent to the Crosses' accountant a Form 807-AD memorializing the agreement, and requested that the accountant obtain the defendants' signatures and return the form within ten days. See <u>Cross v. United States</u>, 1998 WL 255054, at *1.  After several years of making payments to the IRS, the IRS levied on the Crosses' property to collect additional taxes owed, and the Crosses' attorney then requested that the IRS produce a copy of the statutory deficiency for 1974–76 and 1979–80, and the Crosses' Form 807-AD, if any, waiving their statutory notice requirements.  See <u>Cross v. United States</u>, 1998 WL 255054, at *1-2.  When

the IRS told the Crosses' attorney that it could not locate the Form 807-AD, the Crosses filed suit asking the district court to enjoin the IRS levy or any attempt to collect taxes the Crosses allegedly owed.  See Cross v. United States, 1998 WL 255054, at *1-2.  The district court granted the Crosses' request for a preliminary injunction, reasoning that the IRS had the burden to demonstrate that the "Crosses had waived the notice of deficiency requirements for the subject tax years" and that the IRS had not met that burden.  Cross v. United States, 1998 WL 255054, at *1-2.  The IRS filed a response and presented several IRS officers' affidavits "regarding its routine practices in entering into agreements with taxpayers," which explained that "agency procedures required five levels of review before a case could be closed and a tax assessment made."  Cross v. United States, 1998 WL 255054, at *2.  The affidavits asserted that "none of these five steps would be completed unless a Form 870-AD had been signed by the taxpayers," as "[t]he standard procedures made it virtually impossible to permit an assessment without the taxpayers' signature on Form 870-AD." Cross v. United States, 1998 WL 255054, at *2 (internal alterations and citations omitted).  Based on these affidavits, the district court concluded that, "although the IRS has been unable to produce a signed copy of the Form 870-AD, it has met its burden of proof through the use of circumstantial evidence," and dissolved the preliminary injunction.  Cross v. United States, 1998 WL 255054, at *2 (internal alterations and quotations omitted). The Tenth Circuit agreed, upholding both the district court's decision to admit the secondary evidence under rule 1002 and its decision that the affidavits were sufficient to conclude that the Crosses' had executed the Form 870–AD.  See Cross v. United States, 1998 WL 255054, at *5-9.

The Court has previously concluded that, where the United States failed to preserve text messages responding to the defendant's text messages, the person who responded to the

defendant's text messages and another witness who saw the text messages could both testify about the contents of the lost text messages. See United States v. Harry, 927 F .Supp .2d 1185 (D.N.M. 2013)(Browning, J.). The United States sought to use the text messages against the defendant, Myron Harry, that he sent the morning after his alleged sexual assault, and Harry moved to suppress the text messages on the grounds that the messages were unfairly prejudicial without the reply text messages from Harry's friend, Dmitri Wauneka, on the other side of the conversation. Wauneka testified at the suppression hearing that he may have replied to each of eight messages about the assault, and that he showed another individual, Stephanie Johnson, each text message he wrote in reply to Harry's messages. See United States v. Harry, 927 F. Supp. 2d 1194-95.  The criminal investigators with the Navajo Nation interviewed Harry and Wauneka, and Harry told the investigators that he was text messaging with Wauneka, but when the criminal investigators interviewed Wauneka, although Wauneka's reply messages were stored on his telephone, and although one of the investigators saw those reply messages, the investigators photographed only the text messages that Harry sent and not those that Wauneka sent.  See United States v. Harry, 927 F. Supp. 2d 1196-97.  Because the United States possessed the text messages that Wauneka sent in reply to Harry's text messages when the United States interviewed Harry and Wauneka after the alleged sexual assault, but did not preserve them, Harry argued that the Court should suppress his text messages.  See United States v. Harry, 927 F. Supp. 2d 1192-93.  The Court concluded that Harry's messages were admissible, and that the United States did not act in bad faith in losing Wauneka's text messages, because the reply messages' exculpatory value, if any, was not immediately apparent, and the cellular telephone, not the government, deleted the messages.  See United States v. Harry, 927 F. Supp. 2d 1219-28.  The Court noted that, "although

rule 106 might have allowed Harry to introduce Wauneka's outgoing text messages at trial, Harry is not left without a remedy," because, under rule 1004, Harry "may be able to testify himself as to, or elicit from the testimony of other witnesses, a description of Wauneka's outgoing messages," subject, however, to the hearsay rules and the other Federal Rules of Evidence. United States v. Harry, 927 F. Supp. 2d 1227.

## ANALYSIS

The Court concludes that it will likely need to abstain, under Younger, from enjoining an ongoing state proceeding where: (i) there are ongoing State administrative proceedings; (ii) the regulation and licensure of dentists involves important State interests; and (iii) the State proceedings afford Dr. Gardner an adequate opportunity to raise the federal issues.[13]  See Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d at 875.  Even if the State proceedings are no longer ongoing, the Court would likely have to refrain from hearing the case the Rooker-Feldman doctrine, because the Court cannot serve as an appellate court to State court proceedings.  See Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *19. The Court also concludes that Dr. Gardner does not meet the Tenth Circuit's requirements for injunctive relief, because he cannot

---

[13]Gardner only seeks an injunction; he does not seek damages.  See Motion ¶ 1, at 1.  If Gardner brought a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a state court proceeding, the Court would have to dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  See Myers v. Garff, 876 F.2d at 81 (holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended). See also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings); Deakins v. Monaghan, 484 U.S. at 202 (concluding that if a petitioner has brought claims which "cannot be redressed in the state proceeding," the district court should stay the federal proceedings pending the conclusion of the state litigation).

show that he faces irreparable harm, that he is likely to succeed on the merits of his claim, that his injury outweighs any harm to other parties, or that granting the TRO would be in the public interest. See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d at 1138; Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256.

## I.   THE COURT WILL LIKELY NEED TO ABSTAIN FROM HEARING THIS CASE UNDER YOUNGER ABSTENTION.

A threshold issue is identifying what the State courts have decided and what issues, if any, remain pending, because Dr. Gardner has not provided any documentation of the State court proceedings other than a case number, and the Defendants have provided no briefing.  See Complaint ¶ 22, at 4.  The Court takes judicial notice of the State proceedings, see Fed. R. Evid. 201(b), and the Court analyzes whether it should refrain from hearing the case under the Younger and Rooker-Feldman doctrines.  Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a state court judgment is final nor pray for relief from a state court judgment once it becomes final.  See Martinez v. Martinez, No. CIV 09–0281 JB/LFG, 2013 WL 3270448, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).  The Court concludes that it likely will not exercise jurisdiction over Dr. Gardner's Motion under Younger abstention, because (i) Dr. Gardner admits that there is an ongoing State administrative proceeding; (ii) the State proceeding involves important state interests; and (iii) the State proceeding provides an adequate forum to hear Dr. Gardner's federal claims.  See Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d 1160, 1163 (10th Cir. 1999)  Even if the State proceeding is no longer ongoing, the Court likely would have to refrain from hearing the case the Rooker-Feldman doctrine.

### A.   THE COURT WILL LIKELY NEED TO ABSTAIN UNDER THE YOUNGER ABSTENTION DOCTRINE, BECAUSE   THE COURT SHOULD NOT INTERFERE WITH STATE COURT PROCEEDINGS BY

**GRANTING EQUITABLE RELIEF WHEN THE STATE FORUM PROVIDES AN ADEQUATE AVENUE FOR RELIEF.**

"Generally, federal courts must exercise their jurisdiction when available. However, principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against federal court interference with state court proceedings.'"  Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021, 1024 (10th Cir. 2016)(quoting Steffel v. Thompson, 415 U.S. 452, 460-61, (1974), and citing  Younger, 401 U.S. at 43-45; Sprint Commc'ns, Inc. v. Jacobs, 581 U.S. 69, 73 (2013)("Sprint")).  The framers of the Constitution designed a system in which

> there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

Younger, 401 U.S. at 44.  Federal courts should not interfere with ongoing state court proceedings "by granting equitable relief such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" when the state forum provides an adequate avenue for relief.  Rienhardt v. Kelly, 164 F.3d at 1302.  A court in the Tenth Circuit should abstain from entertaining cases which implicate the Younger doctrine, so long as an adequate opportunity is afforded in the state court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  This refusal to exercise federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their own affairs."  J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (quoting Seneca-Cayuga Tribe v. Oklahoma, 874 F.2d at 711.

For Younger abstention to be appropriate, the Tenth Circuit has ruled that three conditions must be present: (i) interference with an ongoing state judicial proceeding; (ii) involvement of important state interests; and (iii) an adequate opportunity afforded in the state court proceedings

to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78).  When all of the conditions mandating abstention clearly exist in the record, courts may and should address application of the Younger abstention doctrine sua sponte, as the Court does here.  See Bellotti v. Baird, 428 U.S. at 143 n.10; Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether this case is one that allows for Younger abstention at all.  The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).

In Sprint, the Supreme Court narrowed the application of Younger, see Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(noting that Sprint "significantly limited the reach of Younger to only" three situations), and clarified that "[t]he three Middlesex conditions recited above were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking Younger."  Sprint, 571 U.S. at 81 (emphasis in original).  The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases."  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020).  See Catanach v. Thomson, 718 F. App'x at 598 n.2 (noting that Sprint "significantly limited the reach of Younger to only" three situations and that Sprint "also discounted reliance on the three factors outlined" in Middlesex); MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL

1311241, at *2 (D. Colo. Mar. 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. Dec. 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colo. Bd. of Med. Examiners][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. Aug. 11, 2015)(Mix, M.J.).  In Hunter v. Hirsig, 660 F. App'x 711, 714-17 (10th Cir. 2016)("Hunter"), the Tenth Circuit continued to use Younger's three-condition framework, and applied the three Sprint categories as a sub-set of its analysis whether there are "ongoing state administrative proceedings."  Hunter, 660 F. App'x at 715.  The Tenth Circuit explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where "type" is defined by the three Sprint categories.  Hunter, 660 F. App'x 711, 715 (emphasis in the original).  See id. at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 134 S.Ct. at 588).  The Court finds the framework that the Tenth Circuit employs in Hunter, 660 F. App'x at 715, useful and will apply it here.

### 1.      There Are Ongoing State Administrative Proceedings.

"[T]he proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference."  Hunter, 660 F. App'x at 715 (emphasis in the original). Here, the State proceedings are ongoing.  See Brief on Pending Matters at 3-4.  Although, on the record that the

Court has been able to construct by taking judicial notice of the State proceedings, there are no

pending appeals with the Court of Appeals of New Mexico or the Supreme Court of New Mexico,

see Bear v. Patton, 451 F.3d 639, 642 (10th Cir. 2006)("[I]f a lower state court issues a judgment

and the losing party allows the time for appeal to expire, then the state proceedings have ended."),

in his Brief on Pending Matters filed in state court, Dr. Gardner asserts that, in the New Mexico

state district court, "there remain pending issues that should be permitted to go to trial," because

(i) the New Mexico state district court only has resolved his Appeal of the Dental Board Nov. 26

Decision; and (ii) that the New Mexico state district court has not resolved the issues that his NM

State Court Complaint raises.  Brief on Pending Matters at 3-4.  Because the New Mexico state

district court has not yet granted or denied Dr. Gardner's NM State Court Complaint, the Court

concludes that the state proceedings are ongoing.[14]

Next, regarding the "type of proceeding," Hunter, 660 F. App'x at 716,  Dr. Gardner falls

within the second category that Sprint outlines: "civil enforcement proceedings,"  Sprint, 571 U.S.

at 73.  These proceedings "are akin to criminal prosecutions."  Sprint, 571 U.S. at 73 (citing

Huffman v. Pursue, Ltd., 420 U.S. 592 (1975)).  The Supreme Court explained and gave examples:

> Such enforcement actions are characteristically initiated to sanction the federal
> plaintiff, i.e., the party challenging the state action, for some wrongful act.  See,
> e.g., Middlesex, 457 U.S. at 433-34 (state-initiated disciplinary proceedings against
> lawyer for violation of state ethics rules).  In cases of this genre, a state actor is
> routinely a party to the state proceeding and often initiates the action.  See, e.g.,
> Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619
> (1986)(state-initiated administrative proceedings to enforce state civil rights laws);
> Moore v. Sims, 442 U.S. 415, 419-420 (1979)(state-initiated proceeding to gain
> custody of children allegedly abused by their parents); Trainor v. Hernandez, 431

---

[14]If the Court is incorrect in its conclusion that the state proceedings are ongoing, the Court
address whether it should refrain from hearing the case under the Rooker-Feldman doctrine in the
next section. See Analysis § I(B), infra

U.S. 434, 444 (1977)(civil proceeding "brought by the State in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud); Huffman [v. Pursue, Ltd.], 420 U.S. 598 (1975)(state-initiated proceeding to enforce obscenity laws). Investigations are commonly involved, *80 often culminating in the filing of a formal complaint or charges. See, e.g., [Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc], 477 U.S. at 624 (noting preliminary investigation and complaint); Middlesex, 457 U.S. at 433 (same).

Sprint, 571 U.S. at 79-80.  See Brown ex rel. Brown v. Day, 555 F.3d 882, 891 (10th Cir. 2009)("In these cases, the federal plaintiff [seeks] to thwart a state administrative proceeding initiated to punish the federal plaintiff for a bad act.").  Here the Dental Board, a state actor, see N.M.S.A. §§ 61-5A-8(A)-(B) (creating the Dental Board), initiated proceedings against Dr. Gardner on May 2, 2019, see Notice of Contemplated Action at 1, and revoked Dr. Gardner's license to practice dentistry, see Dental Board Nov. 26 Decision at 5.  See, e.g., Middlesex, 457 U.S. at 433-434 (state-initiated disciplinary proceedings against lawyer for violation of state ethics rules).  The Dental Board proceedings (i) are mandatory if Dr. Gardner wishes to keep his dental license; (ii) "originated with the state's proactive enforcement of its laws"; and (iii)  are the "wrong which the federal plaintiff seeks to correct via injunctive relief."  Brown ex rel. Brown v. Day, 555 F.3d at 891-92.  See Hunter, 660 F. App'x 711, 713 (concluding that Younger abstention applies where the Wyoming Department of Insurance brought enforcement action against plaintiff licensed to sell insurance); Amanatullah v. Colo. Bd. of Med. Examiners, 187 F.3d at 1162-63 (affirming the application of Younger where the Colorado Board of Medical Examiners instituted reciprocal civil enforcement proceedings to revoke a physician's medical license based on a public reprimand by Nevada Board of Medical Examiners).  Accordingly, the Court concludes that the first Younger condition is satisfied.

### 2. The Regulation and Licensure of Dentists Involves Important State Interests.

The second Younger condition is met, because the regulation and licensure of dentists as a public health matter is an important state interest. See, e.g., Graves v. State of Minn., 272 U.S. 425, 428 (1926)(recognizing that "the State is primarily the judge of regulations required in the interest of public safety and welfare," and that the regulation of dentistry fall under the state's interest to regulate public health); Dyck v. McReynolds, 927 F.2d 603 (6th Cir. 1991)(holding that Younger abstention is appropriate, in part, because "the regulation of the practice of dentistry and insurance are clearly important state interests"); Kalniz v. Ohio State Dental Bd., 699 F. Supp. 2d 966, 972 (S.D. Ohio 2010)(Marbley, J.)("[T]he regulation of the practice of dentistry is an important state interest meeting the second Younger factor"). The regulation and licensure of dentists falls under the state's regulatory authority. See N.M.S.A. §§ 61-5A-1 to 30. The second Younger condition is therefore met.

### 3. The State Proceedings Afford Dr. Gardner an Adequate Opportunity to Raise the Federal Issues.

The third Younger condition is also met, because (i) the administrative proceedings are judicial in nature and provide an adequate forum to hear Dr. Gardner's federal claims; and (ii) Dr. Gardner has raised his federal claim in state court. The Dental Health Care Act, N.M.S.A. §§ 61-5A-1 to -30, and the Uniform Licensing Act, N.M.S.A. §§ 61-1-1 to -35, govern the administrative proceedings. Under § 61-5A-21, the Dental Board may revoke a dental license on fourteen different grounds, as long as the "[d]isciplinary proceedings . . . conform with the provisions of the Uniform Licensing Act." N.M.S.A. § 61-5A-21(B). See N.M.S.A. § 61-5A-21(A). The Uniform Licensing Act establishes procedural standards for notice; method of service; venue of

hearing; the hearings themselves; the right to obtain the information about witnesses and evidence; evidentiary rules, including the right to submit evidence and arguments; a record of the hearing; a written decision; and an opportunity to appeal to state court.   See N.M.S.A. §§ 61-1-3 to -17. These procedures gave Dr. Gardner a reasonable opportunity to litigate his claims: indeed, Dr. Gardner was represented by counsel, filed a motion to dismiss the allegations against him, took a deposition of a witness, and filed motions to recuse.  See NM State Court Complaint ¶¶ 8-47, at 2-10 (describing the procedural history and the various motions Dr. Gardner filed).  See also Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. 619, 629 (1986)(stating that "it would seem an unusual doctrine, and one not supported by the cited case, to say that the [state licensing agency] could not construe its own statutory mandate in the light of federal constitutional principle").   Dr. Gardner also raises his federal issues in state court through an emergency application for a TRO before the Dental Board issued its decision, see NM State Court Complaint at 1, as well as an appeal of the revocation of his license to practice dentistry, see Appeal of Dental Board Nov. 26 Decision at 1. "In any event, it is sufficient under Middlesex, 457 U.S. at 436, that constitutional claims may be raised in state-court judicial review of the administrative proceeding." Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., 477 U.S. at 629.  Accordingly, the state proceedings afford Gardens an adequate opportunity to raise the federal claims.

Because all the Younger conditions are met, the Court will likely have to abstain.  See Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d at 1163 (concluding that if the Younger conditions are met, abstention is non-discretionary).

**B.   EVEN IF THE STATE PROCEEDINGS ARE NO LONGER ONGOING, THE <u>ROOKER-FELDMAN</u> DOCTRINE LIKELY WOULD REQUIRE THE COURT TO ABSTAIN.**

As this Court has already noted, neither party briefed what the state court has decided or provided exhibits of state court decisions or state court filings.  Although the Court concludes that it will likely abstain from hearing the case under <u>Younger</u>, because state proceedings are ongoing, <u>see</u> Analysis § I(A), <u>supra</u>, if the state proceedings have concluded, the Court will likely have to refrain from hearing this case under the <u>Rooker</u>-<u>Feldman</u> doctrine, because the Court cannot function as a court of appeal for state court decisions.  <u>See</u> <u>Lance v. Dennis</u>, 546 U.S. at 460 (citing <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. at 284).  To determine whether the <u>Rooker</u>-<u>Feldman</u> doctrine applies, the Court must first determine what decisions Dr. Gardner is asking the Court to review: the <u>Rooker</u>-<u>Feldman</u> "does not apply to judicial review of state agency decisions." <u>Jicarilla Apache Nation v. Rio Arriba County</u>, 440 F.3d 1202, 1208 (10th Cir. 2006).  The Tenth Circuit has more recently explained:

> [Where] the state court did not review the merits of the state agency decision, the <u>Rooker</u>-<u>Feldman</u> doctrine does not apply to the agency decision. "While the <u>Rooker</u>-<u>Feldman</u> doctrine recognizes that the federal district courts may not review decisions by a state's courts, it does not preclude federal district court review of executive action, including determinations made by a state administrative agency." <u>Mitchell v. Fishbein</u>, 377 F.3d 157, 165 (2d Cir. 2004)(internal quotation marks omitted).  "If the decision of a state agency has been upheld by a state court, then the <u>Rooker</u>-<u>Feldman</u> doctrine applies, because a challenge to the agency's decision necessarily involves a challenge to the judgment of the state court." <u>Narey v. Dean</u>, 32 F.3d 1521, 1525 (11th Cir. 1994).  However, the doctrine is inapplicable to state agency decisions that have not been reviewed by the state courts.  [<u>Narey v. Dean</u>,] at 1525-26; <u>see also</u> <u>Van Harken v. City of Chicago</u>, 103 F.3d 1346, 1349 (7th Cir. 1997)("If the <u>Rooker</u>–<u>Feldman</u> doctrine is to be extended to administrative judgments, it will have to be done by the Court that created it.").

<u>Pretlow v. McPherson</u>, 497 F. App'x 846, 847 (10th Cir. 2012).  <u>Accord</u> <u>Woodward v. Jefferson Cty.</u>, 18 F. App'x 706, 717 (10th Cir. 2001)("The <u>Rooker</u>-<u>Feldman</u> doctrine applies only to judicial

proceedings[,]" as distinguished from administrative proceedings).  For that reason, Rooker-Feldman divests the Court of subject-matter jurisdiction over only the claims seeking to overturn the state courts' judgments, and not over any claims seeking to reverse matters only the Dental Board decided.  Here, although Dr. Gardner does not claim he is asking the Court to review a state court decision, see Complaint  ¶¶ 1-30, at 1-6, Dr. Gardner is seeking only to overturn decisions by the Dental Board that are before the state court, see NM State Court Complaint at 1; Appeal of Dental Board Nov. 26 Decision at 1; therefore, Rooker-Feldman is applicable.  See Narey v. Dean, 32 F.3d 1521, 1525 (11th Cir. 1994)("If the decision of a state agency has been upheld by a state court, then the Rooker–Feldman doctrine applies, because a challenge to the agency's decision necessarily involves a challenge to the judgment of the state court.").

Under the Rooker-Feldman doctrine, federal district courts have no jurisdiction to sit as courts of appeal to state courts.  See Lance v. Dennis, 546 U.S. at 460 (citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. at 284).  The Rooker–Feldman doctrine elements are: (i) a state-court loser; (ii) who is asking a federal district court; (iii) to review the correctness of a judgment rendered by a state court; and (iv) which judgment was rendered before the commencement of the federal proceeding.  See Guttman v. Khalsa, 446 F.3d at 1032.  The Tenth Circuit has made clear that "the Rooker–Feldman doctrine is confined to cases brought after the state proceedings have ended."  Mann v. Boatright, 477 F.3d at 1146 (internal quotation marks omitted).  See Guttman v. Khalsa, 446 F.3d at 1031-32 (holding that Rooker-Feldman doctrine applies only where state court appeals process has run its full course).

In his state court briefing, Dr. Gardner asserts that his state proceedings are still ongoing, maintaining that the New Mexico state district court has yet to deny or dismiss his NM State Court

Complaint.  See Brief on Pending Matters at 3-4.  The New Mexico state district court, however, dismissed Dr. Gardner's Appeal of the Dental Board Nov. 26 Decision and allowed the Dental Board to enforce its decision to revoke Dr. Gardner's license, see Order Lifting the Stay and Dismissing Appeal at 3; therefore, it is unclear whether there are any matters pending in state court, because Dr. Gardner's Appeal of the Dental Board Nov. 26 Decision and NM State Court Complaint raise substantively the same issues.  In addition, Dr. Gardner filed (i) an emergency stay application of the Order Lifting the Stay and Dismissing Appeal with the New Mexico Court of Appeals, which was denied, see COA Order Denying Emergency Stay at 1; (ii) an emergency stay application of the Order Lifting the Stay and Dismissing Appeal with the New Mexico Supreme Court, which was denied, see NMSC Order Denying Emergency Stay at 1; and (iii) a motion for relief from judgment of the Order Lifting the Stay and Dismissing Appeal, which was denied, see Order Denying Relief from Judgment at 1.  If the state court proceedings are concluded, the Court will likely have to refrain from hearing the case under the Rooker-Feldman doctrine, because the Court may not serve as a court of appeal for state courts proceedings.  See Valdez v. Metro. Prop. & Cas. Ins. Co., 2012 WL 1132374, at *19; Bolden v. City of Topeka, Kansas, 441 F.3d 1129, 1143 (10th Cir. 2006)("Appellate review -- the type of judicial action barred by Rooker-Feldman -- consists of a review of the proceedings already conducted by the 'lower' tribunal to determine whether it reached its result in accordance with law.").

The first, second, and fourth Rooker-Feldman elements are satisfied.  See Guttman v. Khalsa, 446 F.3d at 1032.  First, it is likely that Dr. Gardner is a state-court loser, because the New Mexico state district court dismissed his appeal of the Dental Board Nov. 26 Decision and allowed the Dental Board to revoke Dr. Gardner's license.  See Order Lifting the Stay and Dismissing

Appeal at 3 (ordering that "Plaintiff's appellate case is dismissed," and "the [Dental] Board may enforce its [Nov. 26] Decision and Order . . .").  Dr. Gardner also satisfies the second <u>Rooker</u>-<u>Feldman</u> element, because he is before the Court, a federal district court.  Next, Dr. Gardner satisfies the third <u>Rooker</u>-<u>Feldman</u> element, because the New Mexico state district court dismissed Dr. Gardner's appeal of the Dental Board Nov. 26 Decision on July 7, 2020, nearly five-months before Dr. Gardner commenced this action before the Court.

The third <u>Rooker</u>-<u>Feldman</u> element gives the Court some pause, because on the face of Dr. Gardner's Complaint and TRO, he is not asking the Court to review the correctness of the New Mexico state district court's dismissal of his appeal of the Dental Board Nov. 26 Decision; he argues that he is litigating due process issues arising out of the Dental Board's procedures, issues he maintains are separate from that state court decision dismissing his appeal of the Dental Board Nov. 26 Decision.  <u>See</u> Complaint ¶¶ 16-22, at 3-4.  <u>Rooker</u>–<u>Feldman</u> would not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or judgment." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1145.  Thus, where a plaintiff does not put the state court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject matter, or even the same claims, as those presented in the state-court action." <u>Bolden v. City of Topeka</u>, 441 F.3d at 1139.  In other words, "'[i]f a federal plaintiff presents some independent claim, *albeit one that denies a legal conclusion that a state court has reached* in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" <u>Bolden v. City of Topeka</u>, 441 F.3d at 1143 (emphasis in the original)(quoting <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. at 290).  The Court concludes, contrary to Dr. Gardner's assertion, that Dr. Gardner is asking the Court to review the

correctness of a decision rendered by a state court, because he requests the Court enjoin the Defendants from doing exactly what the New Mexico state district court stated the Defendants may do: "the [Dental] Board may enforce its [Nov. 26] Decision and Order" revoking Dr. Gardner's license to practice dentistry.  Order Lifting the Stay and Dismissing Appeal at 3.  In the TRO, Gardner "seeks a Temporary Restraining Order enjoining the Defendants . . . from taking any action that would limit, suspend, or revoke Plaintiff's license to practice dentistry . . . ." Motion ¶ 1, at 1.  What Gardner is seeking, is, in effect, a review of a state court order dismissing Gardner's Appeal of the Dental Board Nov. 26 Decision, because, if the Court were to grant Gardner's request for a TRO, it would contradict the New Mexico state district court's order, something the Court is not permitted to do.[15]     See Guttman v. Khalsa, 446 F.3d at 1032.  Accordingly, the Court concludes that if the state court proceedings have concluded, the Court will likely have to refrain from hearing this case under the Rooker-Feldman doctrine.

## II.    THE COURT CONCLUDES THAT A TRO IS NOT APPROPRIATE, BECAUSE DR. GARDNER DOES NOT MEET THE TENTH CIRCUIT'S REQUIREMENTS FOR INJUNCTIVE RELIEF.

The requirements for a TRO are essentially the same as those for a preliminary injunction order.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d at 1138.  In both cases injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.  Greater Yellowstone

---

[15]In the Complaint, Gardner suggests that he is not seeking a review of the state court decision, because the "state court dismissed Plaintiff's appeal without reaching the merits." Complaint ¶ 22, at 4.  However, Rooker-Feldman does not ask whether the state court reached the merits, it only asks whether Dr. Gardner is seeking to review the correctness of a judgment rendered by a state court.  See Guttman v. Khalsa, 446 F.3d at 1032.

Coalition v. Flowers, 321 F.3d at 1256.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the Dr. Gardner must show: (i) that there is a substantial likelihood of success on the merits; (ii) that he is likely to suffer irreparable injury; (iii) that the threatened injury if the Court does not issue the preliminary injunction outweighs any damage the proposed injunction may cause; and (iv) that the injunction would not be adverse to the public interest.  See Resolution Trust Corp. v. Cruce, 972 F.2d at 1198.  See also Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.")(citing Munaf v. Geren, 553 U.S. at 688-89).  The Court concludes that Dr. Gardner does not meet the Tenth Circuit's requirements for injunctive relief, because (i) he is not likely to succeed on the merits of his claim, because the Dental Board likely did not violate his due process rights; (ii) he cannot show that he faces irreparable harm; (iii) his injury does not outweigh any harm to other parties; and (iv) that granting the TRO would not be in the public interest.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d at 1138; Greater Yellowstone Coalition v. Flowers, 321 F.3d at 1256.

> ### A.   GARDNER IS NOT LIKELY TO SUCCEED ON THE MERITS, BECAUSE, ALTHOUGH DR. GARDNER HAS A PROPERTY INTEREST IN HIS LICENSE TO PRACTICE DENTISTRY, THE DEFENDANTS LIKELY AFFORDED HIM AN APPROPRIATE LEVEL OF PROCESS.

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. at 434.  It is insufficient, moreover, that a moving party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm.

- 75 -

Diné, 839 F.3d at 1282.  "The Fourteenth Amendment provides that a state shall 'not deprive any person of life, liberty, or property, without due process of law.'"  Lauck v. Campbell Cty., 627 F.3d 805, 811 (10th Cir. 2010)(quoting the Fourteenth Amendment).  Courts follow a two-step inquiry to evaluate procedural due process claims: "(1) Did the individual possess a protected interest to which due process protection was applicable?  (2) Was the individual afforded an appropriate level of process?"  Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J, 464 F.3d 1182, 1189 (10th Cir. 2006).  See Mathews v. Eldridge, 424 U.S. at 334-35.  The Court concludes: (i) that Dr. Gardner has a property interest in his professional license to practice dentistry; and (ii) that the Defendants afforded Dr. Gardner an appropriate level of due process.  Accordingly, Dr. Gardner is not likely to succeed on the merits of his due process claim.

### 1.    Dr. Gardner Has a Property Interest in His Professional License to Practice Dentistry.

As to the first procedural due process prong, without citation to case law, Dr. Gardner contends that he has a property interest in his license to practice dentistry.  See Complaint ¶ 18, at 3.  Dr. Gardner contends that the Defendants "were acting under color of state law in considering and acting on a complaint seeking the revocation of Plaintiff's license to practice dentistry in New Mexico."  Complaint ¶ 8 at 2.  The Court concludes that Dr. Gardner alleges sufficiently that the Defendants were involved in the decision to revoke Dr. Gardner's license to practice dentistry, which has deprived him of his property interest in his professional license.

Dr. Gardner contends that he has a property interest in his license to practice dentistry.  See Complaint ¶ 18 at 3. There is established law clearly indicating that an individual has a protected property interest in a professional license.  See Barry v. Barchi, 443 U.S. 55, 64 (1979)(holding that an individual has a protected property interest as a state licensed harness racing trainer); Bell

- 76 -

v. Burson, 402 U.S. 535, 539 (1971) (a license to practice one's calling or profession is a protected property right); Keney v. Derbyshire, 718 F.2d 352 (10th Cir. 1983)(a license to practice medicine is a protected property interest).  See also Schware v. Board of Bar Examiners, 353 U.S. 232, 238-39 (1957)("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.").   Furthermore, a license to practice medicine is a property right deserving constitutional protection, including due process.  See Green v. McElroy, 360 U.S. 474, 492 (1959).   Additionally, the Tenth Circuit has recognized a property interest in a license to practice dentistry.  See Seay v. Campbell, 130 Fed. App'x. 268 (10th Cir. 2005)(unpublished). Until January 1, 2020, Dr. Gardner was a practicing dentist in New Mexico pursuant to a license that the Dental Board issued and regulated.  See Complaint ¶ 9, at 2.  Accordingly, the Court concludes that Dr. Gardner has a property right in his professional license to practice dentistry. See Seay v. Campbell, 130 Fed. App'x. at 268.

## 2.    The Defendants Likely Afforded Dr. Gardner Adequate Levels of Procedure.

The Court turns next to the second procedural due process prong -- "Was the individual afforded an appropriate level of process?"  Kirkland v. St. Vrain Valley Sch. Dist. No. Re–1J, 464 F.3d at 1189.  Dr. Gardner argues that the Defendants deprived him of due process because (i) they "den[ied] him a meaningful right to confront and cross-examine his accuser and den[ied] [him] his right to examine and respond to documentary evidence," evidence which he alleges was "unilaterally destroyed" by Delta Dental; and (ii) they denied his right to a neutral decision-maker, because "each of the Defendants has a material financial conflict of interest with . . . Delta Dental." Motion ¶ 3, at 2.

"The fundamental requisites of due process consist of notice and an opportunity to be heard at a meaningful time and in a meaningful manner." Turney v. FDIC, 18 F.3d 865, 868 (10th Cir. 1994). See Goldberg v. Kelly, 397 U.S. at 267. The Court analyzes three factors to determine whether the Defendants provided Dr. Gardner with adequate procedures under the Due Process Clause:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. at 335. See Watson ex rel. Watson v. Beckel, 242 F.3d at 1240. The Supreme Court has counseled that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Neither party briefed the due process issues, other than Dr. Gardner stating that his due process rights were violated. See Motion ¶ 3, at 1-2. Although TROs occur on an expedited basis, this is no reason to show up to federal court with minimal or no briefing. Dr. Gardner has the burden to show that he has a substantial likelihood to prevail on the merits, see Resolution Trust Corp. v. Cruce, 972 F.2d at 1198, yet his TRO is barely four pages, with only one paragraph of argument on procedural due process, see Motion ¶ 3, at 1-2, and Dr. Gardner attaches no evidentiary exhibits to his Motion or to his Complaint. The Defendants provided no responsive briefing. The Court concludes, according to Mathew v. Eldridge, that the Defendants provided Dr. Gardner with adequate process because, in balance, Dr. Gardner's property interest in his professional license, does not outweigh the minimal risk of erroneous deprivation and the State's important interest in regulating the dental profession.

      **a.**      **The Dental Board's use of Photocopies of the X-Ray -- Instead of the Original -- Likely Did Not Place Dr. Gardner at Risk of Erroneous Deprivation, Because Dr. Gardner Cannot Show Prejudice, and He had the Opportunity to Raise any Allegations <u>of Bad Faith with the Dental Board</u>.**

Dr. Gardner argues that the Defendants denied him the right to "confront," "examine and respond to documentary evidence," because the dental x-rays that he allegedly altered were "knowingly" and "unilaterally destroyed" by Delta Dental.  Motion ¶ 3, at 2.   Dr. Gardner cites <u>Goldberg v. Kelly</u>, which holds that "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses," <u>Goldberg v. Kelly</u>, 397 U.S. at 269, and <u>Greene v. McElroy</u>, 360 U.S. 474 (1959), where the Supreme Court stated:

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.  While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.   We have formalized these protections in the requirements of confrontation and cross-examination.   They have ancient roots.   They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him.' This Court has been zealous to protect these rights from erosion.   It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny.

<u>Greene v. McElroy</u>, 360 U.S. at 496-97 (citations and footnotes omitted).  <u>See</u> Motion ¶ 3, at 2. Here, the issue is missing documentary evidence -- an original dental x-ray that Dr. Gardner allegedly altered.  <u>See</u> Motion ¶ 3, at 2.  The Dental Board relied on photocopies of the original x-ray, which were provided to the Dental Board in the Insurance Fraud Complaint.  <u>See</u> Dental Board

Nov. 26 Decision at 5; NM State Court Complaint at 57-60.  The procedural due process concerns therefore are not as grave as when there is missing "testimony of individuals whose memory might be faulty."  Greene v. McElroy, 360 U.S. at 496.

To establish a denial of due process, however, Dr. Gardner must show that he was prejudiced from the allegedly inadequate procedure.  See, e.g., Mays v. Colvin, 739 F.3d 569, 573 (10th Cir. 2014)("A due process claim will not succeed, however, if the claimant fails to show prejudice."); Watson ex rel. Watson v. Beckel, 242 F.3d at 1242 (holding that a student must show prejudice to establish a due process violation).  "Thus when 'a party complains about the *course* of administrative proceedings, that party must demonstrate that the adjudication was infected by some prejudicial, fundamentally unfair element.'"  Mays v. Colvin, 739 F.3d at 573 (emphasis in the original)(quoting Energy W. Mining Co. v. Oliver, 555 F.3d 1211, 1219 (10th Cir. 2009)).  In other words, Dr. Gardner must show that he was prejudiced when the Dental Board's relied on photocopies of the original x-ray instead of the original x-ray.  See Mays v. Colvin, 739 F.3d at 573.  Here, there are several reasons why Dr. Gardner cannot show prejudice on the record before the Court: (i) Dr. Gardner does not allege that the original x-ray would demonstrate that he did not alter it; (ii) the Insurance Fraud Complaint includes photocopies of the allegedly altered x-ray and Dr. Gardner does not allege that these images are inaccurate; (iii) the record does not show that the x-ray was lost or destroyed in bad faith; and (iv) Dr. Gardner deposed the author of the Insurance Fraud Complaint, who handled the x-ray.

First, Dr. Gardner does not explain how the original x-ray would demonstrate that he did not alter it.  See Motion ¶ 3, at 2.  Perhaps Dr. Gardner assumes that the original x-ray would speak for itself, but it is his burden to show prejudice, and the mere loss or destruction of evidence is not

enough to establish a due process violation.  See Mays v. Colvin, 739 F.3d at 573.  Second, Dr. Gardner does not explain why he was prejudiced when the Dental Board relied upon copies of the x-ray that were provided in the Insurance Fraud Complaint.  See Dental Board Nov. 26 Decision at 3 (discussing the copy of the x-ray).  The Dental Board closely scrutinized the photocopies of the allegedly altered x-ray, see Dental Board Nov. 26 Decision at 3, but Dr. Gardner does not allege these copies are inaccurate, misleading, problematic, or otherwise prejudicial.  See Motion ¶ 3, at 2.  Third, even if the Federal Rules of Evidence applied to administrative proceedings -- which they do not, see Richardson v. Perales, 402 U.S. 389, 400-01 (1971); Bonilla v. Colvin, No. 12-CV-02182-WYD, 2013 WL 5379881, at *6 (D. Colo. Sept. 26, 2013)(Daniel, J.)("The formal rules of evidence do not apply in administrative hearings . . . .") -- "[a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if . . . all the originals are lost or destroyed, and not by the proponent acting in bad faith," Fed. R. Evid. 1004(a).  See Cross v. United States, 149 F.3d 1190, 1998 WL 255054, at *4 (10th Cir. 1998)(unpublished table decision)(stating that Rule 1004(a) "requires the court to undertake two related inquiries before admitting secondary evidence regarding a document: (1) whether the document in question was actually lost or destroyed, and (2) whether the party offering the document has acted in bad faith.").  Dr. Gardner does not allege bad faith,[16] therefore, these photocopies would be admissible

_____

[16]If Dr. Gardner could show bad faith, under the evidentiary doctrine of spoilation, he would be entitled to adverse inference that the x-ray would have been unfavorable to Delta Dental. Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997).  The Tenth Circuit explains the spoilation doctrine:

> [T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction.  See Coates v.

even in federal court.  See Fed. R. Evid. 1004(a).  Contrary to Dr. Gardner's claim, it is unclear

whether Delta Dental "knowingly" and "unilaterally destroyed" the original dental x-rays, Motion

¶ 3, at 2; the evidence shows only that Delta Dental no longer has the original copy of the x-ray,

see NM State Court Complaint at 63 (quotations from Dep. of Jason Snider at 16:20-22 (taken

June 27, 2019), attached as Exhibit 4 to NM State Court Complaint).  After the Dental Board

---

Johnson & Johnson, 756 F.2d 524, 551 (7th Cir. 1985); see generally Telectron,
Inc. v. Overhead Door Corp., 116 F.R.D. 107 (S.D. Fla. 1987).  The adverse
inference must be predicated on the bad faith of the party destroying the records.
See Vick v. Texas Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975); see
also Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988).  Mere negligence
in losing or destroying records is not enough because it does not support an
inference of consciousness of a weak case. Vick, 514 F.2d at 737.

Aramburu v. Boeing Co., 112 F.3d at 1407.  More recently, the Tenth Circuit has stated:

Spoliation sanctions are proper when "(1) a party has a duty to preserve
evidence because it knew, or should have known, that litigation was imminent, and
(2) the adverse party was prejudiced by the destruction of the evidence."
Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007).
But if the aggrieved party seeks an adverse inference to remedy the spoliation, it
must also prove bad faith.  "Mere negligence in losing or destroying records is not
enough because it does not support an inference of consciousness of a weak case."
Aramburu, 112 F.3d at 1407. Without a showing of bad faith, a district court may
only impose lesser sanctions.  Henning [v. Union Pac. R.R. Co., 530 F.3d 1206,
1220 (10th Cir. 2008)].

Turner v. Pub. Serv. Co. of Colorado, 563 F.3d 1136, 1149 (10th Cir. 2009).  Here, there is no
evidence of bad faith, only negligence.  See NM State Court Complaint at 63 (quotations from
Dep. of Jason Snider at 16:20-22 (taken June 27, 2019), attached as Exhibit 4 of the NM State
Court Complaint).  See also United States v. Shirley, 214 F. Supp. 3d 1124, 1160 (D.N.M.
2016)(Browning, J.)(stating that "'[s]poliation is defined as the intentional destruction of evidence
that is presumed to be unfavorable to the party responsible for its destruction,'" and "spoliation
evidence is admissible to show consciousness of guilt")(quoting United States v. Copeland, 321
F.3d 582, 587 (6th Cir. 2003)(citing Black's Law Dictionary at 1401 (6th ed. 1990)); Pandolfo v.
Labach, No. CIV 08-0231 JB/DJS, 2009 WL 1255529, at *4-5 (D.N.M. Apr. 15, 2009)(Browning,
J.)(discussing spoliation under New Mexico law and noting that "a claim for spoliation of evidence
is high").

initiated proceedings against him, Dr. Gardner deposed the author of the Insurance Fraud

Complaint, and asked: "Do you still have the original image that you received from Dr. Gardner?"

NM State Court Complaint at 63 (quotations from Dep. of Jason Snider at 16:20-21 (taken June

27, 2019), attached as Exhibit 4 to NM State Court Complaint).  The  Insurance Fraud Complaint

author answers: "I believe we do not."  NM State Court Complaint at 63 (quotations from Dep. of

Jason Snider at 16:22 (taken June 27, 2019), attached as Exhibit 4 to NM State Court Complaint).

This exchange is similar to the exchange at issue in Aramburu v. Boeing Co., 112 F.3d 1398 (10th

Cir. 1997), where the deposition testimony showed negligence, not bad faith:

> Q:    Can you show me [the] record for '91?
>
> A:    No, I cannot.
>
> Q:    Where is that?
>
> A:    I took it out.  I took it out of these.  And these were in two or three different
>       spots in my file.  And I took them -- I took his out and I have misplaced it.
>       I put it up for the sole reason of keeping it, and I misplaced it.

Aramburu v. Boeing Co., 112 F.3d at 1407.  Here, the deposition testimony reveals similar

negligence, rather than bad faith.  See NM State Court Complaint at 63 (quotations from Dep. of

Jason Snider at 16:20-22 (taken June 27, 2019), attached as Exhibit 4 to NM State Court

Complaint). It is unclear if the original x-ray was misplaced or lost or destroyed; but there is no

suggestion of intentional conduct made in bad faith.  See NM State Court Complaint at 63

(quotations from Dep. of Jason Snider at 16:20-22 (taken June 27, 2019), attached as Exhibit 4 to

NM State Court Complaint).  Fourth, Dr. Gardner had the opportunity to probe for bad faith when

he cross-examined the author of the Insurance Fraud Complaint, who handled the x-ray, but he

only unearthed negligence.  See NM State Court Complaint at 63.  Dr. Gardner was also able share

the deposition testimony with the Dental Board and the New Mexico state district court.  See NM State Court Complaint at 63.  See also Turner v. Pub. Serv. Co. of Colorado, 563 F.3d 1136, 1150 (10th Cir. 2009)(concluding that a district court did not err in concluding the defendant lack bad faith where the plaintiff had the opportunity to depose a witness and "ask extensive questions regarding" alleged bad faith acts).  Accordingly, the Court concludes that the Dental Board's use of copies of the x-ray, instead of the original x-ray, did not place Dr. Gardner at risk of erroneous deprivation because (i) Dr. Gardner cannot show prejudice; and (ii) he had the opportunity to raise any allegations of bad faith with the Dental Board.

> **b.      Because the Dental Board Does Not Have a Substantial Pecuniary Interest in the Outcome, the Court Concludes that the Dental Board is Likely Impartial.**

Dr. Gardner argues that he was denied his right to a neutral decision-maker, because "each of the Defendants has a material financial conflict of interest with . . . Delta Dental."  Motion ¶ 3, at 2.  "An impartial tribunal is an essential element of a due process hearing.  A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  Miller v. City of Mission, 705 F.2d 368, 372 (10th Cir. 1983)(citing Staton v. Mayes, 552 F.2d 908, 913 (10th Cir. 1977); Bogart v. Unified Sch. Dist. No. 298, 432 F. Supp. 895, 903 (D. Kan. 1977)).  An impartial tribunal "applies to administrative agencies which adjudicate as well as to courts" Withrow v. Larkin, 421 U.S. 35, 46 (1975).  The Court, however, "presumes" "honesty and integrity . . . on the part of" the Dental Board.  Mangels v. Pena, 789 F.2d at 838.  The Court also "presume[s] that administrators are honest and impartial . . . and therefore 'capable of judging a particular controversy fairly on the basis of its own circumstances.'"  Hess, 839 F.3d at 675 (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)).  See Mangels v. Pena, 789 F.2d at

838.  "Because honesty and integrity are presumed on the part of a tribunal, there must be some countervailing reason to conclude that the decisionmaker is actually biased with respect to the factual issues being adjudicated."  Mangels v. Pena, 789 F.2d at 838 (internal citations omitted). Although this presumption is rebuttable, Dr. Garden's burden is "heavy indeed"; he must "lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable."  Hess, 839 F.3d at 675 (citing Winthrow v. Larkin, 421 U.S. at 47, 55).  "Due process is violated only when 'the risk of unfairness is intolerably high' under the circumstances of a particular case."  Mangels v. Pena, 789 F.2d at 838 (quoting Withrow v. Larkin, 421 U.S. at 58).

Although the Court agrees with Dr. Gardner that there is an increased risk of bias when the "adjudicator has a pecuniary interest in the outcome," Withrow v. Larkin, 421 U.S. at 47, the Court concludes that the Dental Board is likely not inherently biased, because the record does not reflect that the Dental Board has a "substantial pecuniary interest" in the outcome of its decision to revoke Dr. Gardner's license.  Gibson v. Berryhill, 411 U.S. 564, 579 (1973).  Dr. Gardner contends that, without citation to the record, that "[t]here is also no dispute that each of the Defendants has a material financial conflict of interest with . . . Delta Dental."  Motion ¶ 3, at 2. In his Complaint, Gardner alleges, and the Court finds for the purposes of this TRO, that all the defendant dentists have a premier contract with Delta Dental, and that the defendant dental hygienists work for employers who have a premier contract with Delta Dental.  See Complaint ¶¶ 12-13, at 2-3.  However, Dr. Gardner does not explain how a premier insurance contract with Delta Dental equates to a "material financial conflict of interest with . . . Delta Dental," Motion ¶ 3, at 2, or is a "substantial pecuniary interest," Gibson v. Berryhill, 411 U.S. 579.  Relatedly, in Ward

v. Vill. of Monroeville, Ohio, 409 U.S. 57 (1972), the Supreme Court found that a Mayor, who

was "authorize[d] . . . to sit as [a] judge[] in cases of ordinance violations and certain traffic

offenses," could not be impartial where "[a] major part of village income is derived from the fines,

forfeitures, costs, and fees imposed by him in his mayor's court."  Ward v. Vill. of Monroeville,

Ohio, 409 U.S. at 59-60 (noting that this income  sometimes totaled more than half the village's

annual income).  See Tumey v. Ohio, 273 U.S. 510, 523 (1927)(concluding that a mayor could not

be not impartial where "in addition to his regular salary, the Mayor received $696.35 from the fees

and costs levied by him against alleged violators," because the mayor had "a direct, personal,

substantial pecuniary interest in reaching a conclusion against him in his case").  The Supreme

Court explained that

> the test is whether the mayor's situation is one "which would offer a possible
> temptation to the average man as a judge to forget the burden of proof required to
> convict the defendant, or which might lead him not to hold the balance nice, clear,
> and true between the state and the accused . . . ."

Ward v. Vill. of Monroeville, Ohio, 409 U.S. at 60 (quoting Tumey v. Ohio, 273 U.S. at 532).  See

In re Murchison, 349 U.S. 133, 136 (1955)(concluding that, under the Due Process Clause, no

judge "can be a judge in his own case [or be] permitted to try cases where he has an interest in the

outcome").  Here, Dr. Gardner does not explain how the Defendants have either "a direct, personal,

substantial pecuniary interest in reaching a conclusion against him in his case," Tumey v. Ohio,

273 U.S. at 523, or how the situation offers the Defendants "'a possible temptation,'" Ward v. Vill.

of Monroeville, Ohio, 409 U.S. at 60 (quoting Tumey v. Ohio, 273 U.S. at 532), to change the

outcome of their decision to revoke his license.  There is no suggestion in the record that Delta

Dental offered the Defendants increased referrals, rates, or other benefits as a result of revoking

Dr. Gardner's license.  See, e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986)(holding

- 86 -

that the Due Process Clause bars trial by a potentially biased judge, where the judge's ruling in a

case before the judge resulted in a favorable outcome in a related case in which the judge obtained

a "tidy sum").  Nor, is there any temptation evident in the record.  Accordingly, because the Dental

Board does not have a vested substantial pecuniary interest in the outcome, the Court concludes

that the Dental Board is likely impartial.

> **c.      Dr. Gardner's Substantial Interest in His Professional License, Does Not Outweigh the Minimal Risk of Erroneous Deprivation and the State's Important Interest in Regulating the Dental Profession Under the Mathew v. Eldridge Balancing Test.**

The first Mathew v. Eldridge factor favors Dr. Gardner: his property interest in his

professional license is "substantial."  Barry v. Barchi, 443 U.S. at 64.  At the other end of the scale,

the State of New Mexico New Mexico and the Dental Board have an important interest in

protecting the integrity, ethics, and character of medical professionals and upholding high public

standards. Cf. Washington v. Glucksberg, 521 U.S. 702, 731 (1997)("The State also has an interest

in protecting the integrity and ethics of the medical profession.").  See Barsky v. Bd. of Regents

of Univ., 347 U.S. 442, 451 (1954)("It is . . . clear that a state's legitimate concern for maintaining

high standards of professional conduct extends beyond initial licensing. Without continuing

supervision, initial examinations afford little protection."); id. (recognizing "the importance of

high standards of character and law observance on the part of practicing physicians").  See also

Graves v. State of Minn., 272 U.S. a 428 (recognizing that "the State  is primarily the judge of

regulations required in the interest of public safety and welfare," and that the regulation of dentistry

fall under the state's interest to regulate public health); Dyck v. McReynolds, 927 F.2d at 603

(holding that "the regulation of the practice of dentistry and insurance are clearly important state

interests");  Kalniz v. Ohio State Dental Bd., 699 F. Supp. 2d at 972 ("T]he regulation of the

practice of dentistry is an important state interest . . ..").  The Court must balance these two competing interests with the "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." Mathews v. Eldridge, 424 U.S. at 335.  The Court concludes that Dr. Gardner was afforded adequate process, because there is likely little risk of erroneous deprivation.  The Court reaches this conclusion, because (i) even though the original x-ray was not available, the Dental Board used photocopies of the x-ray; (ii) Dr. Gardner cannot show prejudice from the use of the photocopies; (iii) Dr. Gardner deposed the author of the Insurance Fraud Complaint;  (iv) he had the opportunity to raise any allegations of bad faith with the Dental Board; and (v) the Dental Board is likely impartial because it does not have a vested pecuniary interest in the outcome.

## B.   THE OTHER THREE FACTORS IN THE TRO ANALYSIS WEIGH AGAINST DR. GARDNER.

Even if Dr. Gardner could establish a substantial likelihood of success on the merits that the Defendants violated his right to due process, Dr. Gardner also must show that he will suffer irreparable harm without a TRO, that the balance of equities weighs in their favor, and that the restraining order is in the public interest.  See Winter, 555 U.S. at 20.  "The Tenth Circuit has acknowledged that the injunctive relief factors can affect each other, and that likelihood of success on the merits impacts the analysis of the remaining factors."  Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926, 1061 (D.N.M. 2020)(Browning, J.)(citing Derma Pen, LLC v. 4EverYoung Ltd., 773 F.3d 1117 (10th Cir. 2014)). The Court concludes that Dr. Gardner has not demonstrated that the remaining three factors support a TRO.

1.      **Dr. Gardner Cannot Show Imminent, Irreparable Harm, Because He Delayed Seeking Injunctive Relief.**

Dr. Gardner argues that, unless the Court grants his TRO, Dr. Gardner's "property rights in his license to practice will be destroyed without due process, and Plaintiff will thereby suffer immediate, serious and irreparable harm before Defendants can be heard in opposition." Motion ¶ 5, 2-3. "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d at 1105 (citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355). "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d at 1190 (quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963)). Dr. Gardner's assertion of the harm is perplexing, he admits that his license has already been revoked more than a full year before he filed his Complaint. See Complaint ¶ 9, at 2 ("Until January 1, 2020, Plaintiff was a practicing dentist in New Mexico pursuant to a license issued and regulated by the Board composed of the Defendants."). See also Dental Board Nov. 26 Decision at 5 (revoking Dr. Gardner's license effective January 1, 2020). Nearly seventeen months ago, Dr. Gardner filed an emergency motion to stay to Dental Board proceedings in State court on the same grounds he is raising here, see NM State Court Complaint at 1; the Dental Board issued its decision revoking Dr. Gardner's license on November 16, 2019, see Dental Board Nov. 26 Decision at 5; and the New Mexico state district court dismissed his appeal on July 7, 2020, see Order Lifting the Stay at 3. Preliminary relief primarily functions to preserve the status quo, and now that the alleged harm has occurred, a TRO

is less pressing.  See RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir. 2009).  "[D]elay is an important consideration in the assessment of irreparable harm for purposes of a preliminary injunction."  GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir. 1984).  See A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5, No. 20-CV-00392-PAB-NRN, 2020 WL 2197920, at *3 (D. Colo. May 6, 2020)(Brimmer, C.J.)("[T]he Court finds that the delay in seeking injunctive relief cuts against plaintiff's assertions of imminent irreparable harm."); Am. Ass'n of People With Disabilities v. Herrera, 580 F. Supp. 2d 1195, 1246 (D.N.M. 2008)(Browning, J.)(finding that plaintiffs' two-week delay from filing lawsuit to seeking preliminary injunction "considerably undercut[ ] their allegation of irreparable harm").  The Court concludes that Dr. Gardner will not suffer "immediate and irreparable injury, loss, or damage" that may result before the Court has time to resolve an application for a preliminary injunction.  Fed. R. Civ. P. 65(b).  See Am. Ass'n of People With Disabilities v. Herrera, 580 F. Supp. 2d at 1246.

### 2.  The Balance of Equities Weighs Against Dr. Gardner, Because He Asserts No Harm Other Than His Due Process Claim, Which Is Unlikely to Succeed.

The third factor that courts consider is whether the "balance of equities tips in [the movant's] favor."  Winter, 555 U.S. at 20.  In analyzing whether a movant satisfies this fact, he or she must show that the "threatened injury outweighs any injury to [non-movants] caused by granting the injunction."  Awad v. Ziriax, 670 F.3d at 1131.  Dr. Gardner argues that "[a]llowing Plaintiff to continue to practice dentistry will not harm Defendants.  Defendants have no legitimate interest in preventing capable and qualified dentists from providing services to the public."  Motion ¶ 6, at 2.  As in the irreparable harm analysis, district courts in the Tenth Circuit must consider the likelihood of success when analyzing potential harm. See Planned Parenthood Ass'n of Utah v.

Herbert, 828 F.3d at 1265 ("The threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account [the plaintiff's] likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to [the plaintiff]."). See also Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1164 (D.N.M. 2020)(Browning, J.).   The Court has already concluded that Dr. Gardner is not likely to succeed on the merits of his procedural due process claim, and Dr. Gardner did not explain how the harm he is suffering extends beyond those claims.  The Dental Board has an interest in upholding the integrity of its profession.  Accordingly, the Court concludes that the balance of the equities weighs against Dr. Gardner.

### 3.   The Requested Injunction Would Be Adverse to the Public Interest, Because the Public Interest in This Case Is Aligned with the Dental Board's Interest.

The last issue to consider is whether the preliminary injunction is in the public's interest. See Winter, 555 U.S. at 20.  This factor "is another way of inquiring whether there are policy considerations that bear on whether the order should issue." 11A Fed. Prac. & Proc. Civ., § 2948.4 Grounds for Granting or Denying a Preliminary Injunction -- Public Interest (3d ed.).  The public interest in this case is aligned with the Dental Board's interest -- ensuring that the medical profession works with integrity and does not fraudulently bill insurance companies.  An injunction from the Court overturning the Dental Board Nov. 26 Decision is thus adverse to the public interest.   See Winter, 555 U.S. at 20.  Any injunction would also upset the status quo that has existed since July, 2020, when the New Mexico district court dismissed Dr. Gardner's appeal.  See Order Lifting the Stay at 3.  The Court is reluctant to enter a TRO without a clear and unequivocal

showing of Dr. Gardner's entitlement to the requested relief.  That showing is lacking here, because Dr. Gardner is not likely to succeed on his procedural due process claim.

**IT IS ORDERED** that the Plaintiff's Motion for Temporary Restraining Order, filed January 4, 2021 (Doc. 3), is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Gary W. Boyle
Boyle Law Office
Santa Fe, New Mexico

 _Attorney for the Plaintiff_

Hector Balderas
 Attorney General for the State of New Mexico
Valerie Joe
New Mexico Office of the Attorney General
Santa Fe, New Mexico

 _Attorneys for the Defendants_